## SARAH P. LINZEE & another *vs.* JOHN MIXER & another.

A deed by the Commonwealth of a lot of land upon the Back Bay in Boston contained a restriction that the front wall of any building erected thereon should be set back twenty-two feet from the street, "provided that steps, windows, porticos and other usual projections appurtenant thereto are to be allowed in said reserved space of twenty-two feet." The grantee built a house on the lot, and projected the whole front wall, except less than two feet at each end, into the reserved space, in the form of a bay running up the whole height of the house, with a foundation, roof and windows. *Held,* that this was a violation of the restriction, though such projections had been usual in Boston for some years, and though the Commonwealth afterwards modified its form of deed in conveying other lands on the Back Bay, so as to allow projections of a nature somewhat similar.

In 1860, the commissioners on public lands, in the name of the Commonwealth, conveyed tracts of land on a street upon the Back Bay in Boston by deeds containing restrictions that the front walls of any buildings erected thereon should be set back twenty-two feet from the street, and reserving a right to the Commonwealth to enter on the premises by its agents, and remove or alter any building erected thereon in violation of these restrictions. The defendant, who had become the owner of a lot of land, part of these tracts, began to erect thereon, in the spring of 1865, a house, the front wall of which projected much nearer than twenty-two feet to the street. The plaintiffs, owners of two adjoining houses, situated next to the defendant's, and also built on part of one of said tracts, pro-

tested against the building of this projection as soon as the defendant began to build it, and applied to the commissioners on public lands, who at first assured them that their rights should be protected, but afterwards, towards the close of 1865, when the defendant's house was completed, informed them that they had decided that it was inexpedient to take action in the matter. In May 1866, an act (St. 1866, *c.* 264) went into effect, that, when the Commonwealth had or should have the right by its agents to enter and remove or alter any building in conformity with the stipulations of any deeds given in the name of the Commonwealth by the commissioners on public lands, all grantees under such deeds should have the right, by proceedings in equity, to compel the commissioners to enter and remove or alter such building. In October 1866, the plaintiffs filed a bill in equity against the defendant and the commissioners, to compel the alteration of the defendant's building. *Held,* that the plaintiffs had not been guilty of laches; that they could maintain their bill without joining as parties all the grantees under similar deeds from the Commonwealth; that they were entitled to relief against the defendant's violation of the restrictions in his deed; and that the case should be referred to a master to report in what manner the relief could be given with the least detriment to all concerned.

BILL IN EQUITY by Sarah P. Linzee, widow, and Ann D. Torrey, singlewoman, filed October 8, 1866, against John Mixer, Marianne M. Crafts, widow, and the commissioners of the Commonwealth on public lands.

The bill alleged that Mrs. Linzee, in May 1864, purchased a lot of land, nineteen and a half feet wide, on Marlborough Street in Boston; that Miss Torrey, who was her sister, purchased at the same time the lot, sixteen and a half feet wide, next easterly on said street; and that Mixer, in January 1865, purchased the lot, eighteen feet wide, next easterly to Miss Torrey's, on the same street; that the whole of the lots of Mrs. Linzee and Miss Torrey, and a part of the lot of Mixer, formed a portion of a larger tract, originally conveyed by the commissioners on public lands, in the name of the Commonwealth, to Caleb W. Loring and Charles F. Choate, trustees, and the remaining part of Mixer's lot formed a portion of a tract originally conveyed by the commissioners on public lands, in the name of the Commonwealth, to William Thomas; and that these two deeds from the Commonwealth were both dated May 2, 1860, and both contained these provisions, namely:

" This conveyance is made upon the following stipulations and agreement: That any building erected on the premises shall be at least three stories high, for the main part thereof, and shall not, in any event, be used for a stable, or for any mechanical or manufacturing purposes , that the front wall thereof, on

Marlborough Street, shall be set back twenty-two feet from said Marlborough Street, provided that steps, windows, porticos, and other usual projections appurtenant thereto, are to be allowed in said reserved space of twenty-two feet. And said Commonwealth reserves the right to enter upon the premises, by its agents, and, at the expense of the party at fault, to remove or alter, in conformity with the above stipulations, any building, or portion thereof, which may be erected on the premises by the said grantees, or their representatives or assigns, in a manner or to a use contrary to the above stipulations."

The bill also alleged that all the subsequent mesne conveyances by which their lots had vested in Mrs. Linzee, Miss Torrey and Mixer, respectively, were made subject to all the stipulations, agreements and provisions in the deeds from the Commonwealth; "all which stipulations, agreements and provisions" "were made, and still exist and continue in full force and validity, for the benefit and protection of all persons who, deriving their titles through or under either or both of said deeds from the Commonwealth, should own lands, and build upon said Marlborough Street, and are applicable to and obligatory upon all such persons; that the Commonwealth had reserved and given to it, by the terms of each and both of said deeds, the right, by its agents, to enter upon the premises by each and both of said deeds conveyed, and, at the expense of the party at fault, remove or alter, in conformity with the stipulations in said deeds contained, any building, or portion thereof, erected on said premises, in a manner or to a use contrary to said stipulations and agreements; and that before, and at, and since, the time of the several conveyances to the plaintiffs as above set forth, they were informed by the commissioners on public lands, not only that the Commonwealth had such rights, but that the Commonwealth would exercise such rights, and enforce all said stipulations, agreements and provisions, and remove or alter, in conformity therewith, any building, or portion thereof, erected to a use or in a manner contrary thereto, and therein and thereby protect all those who should faithfully observe, keep and abide by said stipulations, agreements and provisions."

. It further alleged that, in October 1864, the plaintiffs began each to build a dwelling-house for her own occupation on her own lot, both of which houses were completed in December 1865; that on or about April 1, 1865, at which time the walls and roofs of the plaintiffs' houses were completed, Mixer began to build a dwelling-house on his lot; that the plaintiffs faithfully complied with and conformed to all of the stipulations, agreements and provisions in the deeds from the Commonwealth; that when the plaintiffs purchased their lots and built their houses they believed, and were informed by the agents of the Commonwealth, that whoever should build upon the land subsequently conveyed to Mixer would and should faithfully comply with and conform to all the stipulations, agreements and provisions contained in each and both of said deeds from the Commonwealth, and believed that Mixer would and must faithfully comply therewith and conform thereto; that on March 15, 1865, the plaintiffs were informed that Mixer intended to construct his house with an octagonal front, which would constitute nearly the whole front of his house, and would be beyond the line fixed by the deeds from the Commonwealth; that, as soon as the plaintiffs were informed of Mixer's intention, they protested against it, and requested him to desist, and to construct his house in conformity with the stipulations, agreements and provisions contained in said deeds from the Commonwealth; that Mixer wholly refused, and continued to construct the octagonal front as above set forth; that, after a renewed application to Mixer and a repeated refusal by him, the plaintiffs, (believing that the Commonwealth should and would enter upon Mixer's premises, and remove or alter, in conformity with the stipulations contained in said deeds from the Commonwealth, any buildings, or portions thereof, constructed upon said premises in a manner contrary to said stipulations, and learning that neither of the plaintiffs could, under said deeds, or either of them, so enter and remove or alter such buildings, or portions thereof,) immediately, when the front wall of Mixer's house was built up nearly or quite one story, and on or about May 1, 1865, informed the commissioners on public lands of the wrongdoings of Mixer,

and requested them to enter upon his premises, and remove and alter, in conformity with the stipulations, agreements and provisions of said deeds, the dwelling-house so erected by him contrary to said stipulations, agreements and provisions; that the commissioners thereupon assured the plaintiffs that their rights in the premises should be protected, and that they would protect them; and that the plaintiffs, relying upon such assurances, omitted to move further in the matter at that time; that on or about November 1, 1865, the plaintiffs, having moved into their houses, and finding that the construction by Mixer of his house contrary to the stipulations, agreements and provisions of said deeds from the Commonwealth, obstructed the light, air and view of, to and from the windows of the plaintiffs' houses, and prevented them from enjoying their several estates, to a much greater extent than they had believed would be the case, and neither Mixer nor the commissioners having taken any steps to remove and alter, in conformity with said stipulations, agreements and provisions, the dwelling-house erected by him, again applied to the commissioners, and again requested them to enter upon Mixer's premises, and remove and alter, in conformity with said stipulations, agreements and provisions, said dwelling-house erected by him; and that on December 11, 1865, the commissioners informed the plaintiffs that they had considered the matter and had decided that it was inexpedient to take action thereon.

It then alleged that on or about December 1, 1865, the plaintiffs, being informed that Mixer was negotiating a sale of his house to the defendant Marianne M. Crafts, and before such negotiation was completed, informed Mrs. Crafts of their claims and rights, and of their intention to use every legal means to have the house removed and altered in accordance with said stipulations and provisions; that Mrs. Crafts thereupon refused to complete the purchase unless and until Mixer gave her a written instrument binding himself to protect her against any claims of the plaintiffs on account of the construction of the house as aforesaid; and that Mixer gave such an instrument, and Mrs. Crafts purchased the house.

It further alleged that on May 26, 1866, was passed " An act
for the protection of rights of grantees of the Commonwealth
lands upon the Back Bay ; " * that on July 7, 1866, the plaintiffs
again applied to the commissioners and again requested them,
in accordance with the provisions of said deeds, and further by
virtue of the power and authority of said statute, to enter on
the premises sold by Mixer to Mrs. Crafts, and remove or alter
the house in conformity with the said stipulations, agreements
and provisions ; and that the commissioners, on July 14, 1866,
replied that they did not feel authorized to take any steps in the
matter unless ordered to do so by this court.

The prayer was, that Mixer and Mrs. Crafts, and their assigns,
should be perpetually enjoined and restrained from having the
said house so constructed contrary to the stipulations, agree-
ments and provisions of said deeds from the Commonwealth ;
and from so without right interfering with the light, air and view
of, to or from the windows and other portions of the plaintiffs'
houses ; that Mixer and Mrs. Crafts should be ordered to re-
move or alter said house, so far as the same was built contrary
to the stipulations, agreements and provisions of said deeds ;
and that the commissioners should be ordered to enter upon the

* This act (St. 1866, *c.* 264) is as follows:

" § 1. In all cases where the Commonwealth has or shall have the right, by
its agents, and at the expense of the party at fault, to enter upon premises and
remove or alter any building or portion thereof, in conformity with the agree-
ments or stipulations of any deed or deeds given in the name of the Common-
wealth by the commissioners on the Back Bay, or on public lands, all grantees
under such deeds, and their legal representatives and assigns, shall have the
right, by proceedings in equity, to compel the commissioners on public lands,
for the time being, so to enter and so to remove or alter such buildings or por-
tions thereof.

" § 2. The supreme judicial court shall, as a court of equity, have full juris-
diction and power to hear and determine all matters and questions arising un-
der this act, and full powers to make such orders and decrees as justice and
equity may require to make the rights thereby granted effectual.

" § 3. It shall be the duty of the attorney general, in all proceedings under
this act, to appear for the commissioners, and attend to the interests of the
Commonwealth.

" § 4. This act shall take effect upon its passage."

lot on which Mixer had built said house, and remove or alter said house, or any portions thereof erected contrary to said stipulations, agreements and provisions.

The answer of the defendant Mixer admitted the purchase of the lots by himself and the plaintiffs, that the deeds from the Commonwealth contained the stipulations, agreements and provisions set forth in the bill, and that the mesne conveyances of each lot of land were made subject to the stipulations, agreements and provisions in the deed from the Commonwealth of the same land; but denied " that said stipulations, agreements and provisions were made, or exist, or are in force or validity, for the benefit and protection of all persons who, deriving their title through or under both of said deeds from the Commonwealth, should own land and build upon Marlborough Street."

It admitted the building of the houses by the plaintiffs and by himself, and alleged that his house was finished on or about November 1, 1865; denied that he constructed his said house in the manner and form alleged in the bill, or in any manner and form contrary to the agreements, stipulations and provisions contained in either of said deeds, or beyond the line fixed thereby, or that he constructed any part thereof within the space of the twenty-two feet reserved by said deeds, except so far and in such manner and particulars as he was permitted and allowed so to do by the terms of the deeds, and by those having any right reserved by the deeds to object thereto; and alleged that any right of the Commonwealth to enter on the premises, and alter or remove any buildings erected contrary to the provisions of said deeds, had been, as against himself and Mrs. Crafts, wholly waived and lost before the filing of the plaintiffs' bill.

It further denied any protest by the plaintiffs against the construction of the defendant's house, or any request to him to desist; admitted that the plaintiffs informed Mrs. Crafts, before her purchase of the house, of their pretended claims and their intention of enforcing them, and that the defendant gave Mrs. Crafts a written obligation to indemnify her against pecuniary oss on account of such claims; alleged that, at the time of the sale to Mrs. Crafts, the house had been fully completed at great

expense, and that the commissioners had never interfered, and had expressly declined to interfere, with its construction, while the building was going on.

The answer of Mrs. Crafts was to the same effect as that of Mixer, and also alleged that she purchased the house from Mixer for her own occupancy; that she occupied it as her dwelling; and that to grant the prayer of the plaintiffs would do her an irreparable injury, against which she had no indemnity from Mixer except a pecuniary indemnity.

The answer of the commissioners on public lands admitted the several conveyances set forth in the bill, that they were all made subject to the stipulations, agreements and provisions contained in the deeds from the Commonwealth, and that Mixer had built his house substantially as alleged in the bill; but declared their ignorance whether such building was in violation of the said stipulations, agreements and provisions, and prayed the judgment of the court on the point; admitted the substantial accuracy of the statements in the bill as to the interviews, transactions and representations between themselves and the plaintiffs; and declared their willingness to obey all orders of the court in the premises.

It was agreed by the parties that the form of the deeds under which the land was conveyed by the Commonwealth to Loring and Choate, and to Thomas, was the form which, up to 1863, the commissioners had printed and circulated in Boston as the form of deed by which the Commonwealth would convey lands upon the Back Bay, and that on the back of this form were printed notes, one of which was: "On Marlborough Street, the front wall shall be set back twenty-two feet." The case was referred to a special commissioner to take evidence.

John Revere, brother in law and agent of the plaintiffs, testified as follows: "I learned of Mixer's intention to build, in March 1865, and in the last of April his house had so progressed that my attention was called to the form of the front. Part of the foundation was in, and the general shape of the front indicated. I met Rand, Mixer's architect, there constantly. As soon as I was satisfied that his profile infringed upon the restric-

tions upon that front, I told him he was infringing upon the terms and stipulations of the deed. He replied that he was not. I was there almost daily up to the middle of May. I saw that Mixer's men continued in constructing the house as they had commenced. I went to Mixer's office early in May. Some of the brickwork of the first story was up at that time, and the form of the house was well defined. I told Mixer that I feared he did not appreciate the course his agent was pursuing; that he was clearly breaking the restrictions placed in the deed upon that land; that I was building these houses for my sisters as a permanent home; that I was unwilling to inaugurate their residence with a quarrel with their next-door neighbor; but that I felt it was my duty to resist this in every way possible, and that I should do so. Mixer replied that he would not allow his agent to do anything that was contrary to the deed, and that he was not aware that he had; that he was lame that day, and could not go up to the state house that day to the commissioners, but when he came in town the next day he would stop there and see the commissioners. In the conversation, I told him that I should make a demand upon the commissioners to protect the interests of the plaintiffs. Under advice, I prepared a formal notice in writing to Mixer a few days subsequently, and sent it to his office by a messenger, who stated to me that he had delivered it. That messenger is now dead. I have no further knowledge than this whether it was delivered or not. The first week in May 1865, I went to the office of the commissioners, saw Purdy, one of the commissioners, and told him I wanted to see them as to, the manner in which Mixer was constructing a house on Marlborough Street. Purdy heard my complaint; said that he understood me; that ' it was that Kirby business over again; that they had had trouble enough about that, and that he would put a stop to it.' He then said he would go down and inspect it. Within a few days I appeared before the commissioners, by appointment, May 6, 1865, and found Purdy and the clerk of the commissioners present. After some delay, Purdy said that he ¹id not know why the other commissioners had not come, but that we might proceed, and he would present it to them; that

he had been down and looked at the house; that it was too bad; and that we might rely on having justice. Mixer was not present, and I do not, of my own knowledge, know that he was notified to be present."

" On or about May 19, 1865, I saw Rand on the premises, with a plan in his hand. I told him that he was continuing his infringement. He said he was all right, and showed me the plan. I insisted that he was wrong; that the commissioners had assured me they would protect me; that he might rely upon it, that, if he persisted, I should use every means in my power to prevent it. As far as I can recollect, the portico and appendages were not completed till the autumn of 1865. In November 1865, I waited upon the commissioners again by appointment. I protested at their inaction, and demanded that they should proceed to protect us, as they had assured us they would. They heard us; and Haven, another of the commissioners, met me on the premises the next morning; he went into the houses, looked out of our windows, and said that it was an ' outrageous case,' and that it ' should be righted.' Mixer was not present on any of these occasions."

The defendant Mixer testified as follows : " The first formal notice I received from Revere, in regard to the manner of building my house on Marlborough Street, was on November 7, 1865, when he sent me a letter on the subject, bearing date that day. I have heard and read the testimony given by Revere in this case, and remember his calling on me, as he states, probably in May 1865, which was the only time that he did call. The principal conversation was in regard to my paying him for one half of the division wall between myself and Miss Torrey. I had objected, and did then object, to paying for that wall until he paid me for the land which I claimed that he had taken from me in building Miss Torrey's wall. There was a question between us about the measurements of our respective lots, I claiming that he was occupying some of my land, and he denying that he occupied as much as I claimed. There was a good deal said between us on that subject. I think he might have said something about my violating the restrictions in my deed; but

I did not understand that he made any serious objections to what I was doing; and I am quite sure that I never promised to see the commissioners on the subject, or that he asked me to do so, as he has stated in his testimony. The notice which Revere states that he prepared and sent to me by a messenger in May 1865, I never received. I keep all my letters with great care, and file them, and can produce every letter I have received for years. I have carefully examined all my papers; and the only letter on the subject from Revere, which I can find, is the one which I have mentioned, dated November 7. I am sure that I never received any letter in May, or any other letter than the one I have mentioned; because, first, if I had, I should have remembered it; and, next, I should have found it among my letters and papers. I never received any notice from the commissioners, or either of them, written or verbal, or any intimation that I must not or ought not to build the house in question in the manner and form in which the same is built, and with the projections as they now stand. After the house was all built, the commissioners notified me to appear before them, and I did so. Purdy said that Revere had complained about my manner of building my house. Revere was not present, and the matter dropped by Purdy's suggesting that Lee, another of the commissioners, had better go and see the house. Lee then went with me and looked at the premises, and while there said that he did not see that my house was built out more than many others on the same street. He made no objections to me about what had been done; neither did either of the other commissioners. This was towards the end of November 1865."

James H. Rand, the architect employed by Mixer to build his house, testified that Purdy, in answer to a question in relation to the restrictions in Mixer's deed, said that he (the witness) had better follow, in constructing the house, the terms of the restrictions in the form of deeds used by the commissioners since January 28, 1863, conveying the lands of the Commonwealth on the Back Bay, which form of deed provided, " that the front wall thereof on [street or avenue] shall be set back twenty [or twenty-two] feet from said [street or avenue], but steps, win-

dows, porticos and other usual projections appurtenant to said
front wall are to be allowed in this reserved space of twenty [or
twenty-two] feet, subject to the following limitations, namely,
first, that no projection of any kind (other than door-steps and
balustrades connected therewith, and also cornices at the roof of
the building) will be allowed to extend more than five feet from
said front wall into said space ; and, second, that no projection
in the nature of a bay-window, circular front or octagon front,
with the foundation wall sustaining the same, (such foundation
wall being a projection of front wall,) will be allowed, unless
any horizontal section of such projection would fall within the
external lines of a trapezoid, whose base upon the rear line of the
aforesaid space does not exceed seven tenths of the whole front
of the building, nor exceed eighteen feet in any case, and whose
side lines make an angle of forty-five degrees with the base ; and
each house in a block shall be considered a separate building
within the meaning of this limitation ; " that Purdy made no
objection to his building in any form, but simply advised ; and
that this was about the time he was drawing the plans.

Franklin Haven, one of the commissioners on public lands,
testified as follows : " Soon after the Commonwealth had given
deeds of lands on the Back Bay, in the form of the deeds to
Loring and Choate, and to Thomas, it became a question what
projections could be built out into the reserved space. Some
persons built octagonal projections ; and, to avoid future diffi-
culty, the commissioners established the new form of deed which
has been used since January 28, 1863, and as given in the tes-
timony of Rand. The commissioners always considered that
this was a fair construction of the restrictions and limitations of
the former deed, and, on October 26, 1865, voted accordingly.
The commissioners never, to my knowledge, made any unquali-
fied promise to Revere or the plaintiffs, that any of their rights
should be protected. The Commonwealth has nót, to my
knowledge, any interest in the question pending between the
parties to this case, and the commissioners have not instigated
this suit. I have no recollection that the commissioners ever
notified Rand or Mixer not to build his house in any particular

form; and, if any such notification had been given, it ought to appear of record."

From drawings and plans in evidence, it appeared that Mixer built twenty-one inches of each end of his front wall upon the line twenty-two feet back from Marlborough Street; then projected at a right angle his front wall seven inches into the reserved space; then, beginning with a base of fourteen feet six inches, at angles of forty-five degrees, with sides five feet ten inches, and a terminating front of five feet ten and one half inches, projected his front wall four feet one and one fourth inches further into the reserved space; making the total projection of the front wall into the reserved space four feet eight and one fourth inches; that the front, thus produced, was carried in a solid form to the roof of the building, and was lighted in each story by windows in the sides and front; and that under the portico, and within the reserved space, there was constructed a space four feet and four inches high, in the clear, lighted by a window opening upon the steps of Miss Torrey's house.

It also appeared in evidence that projections of the fronts of houses, in the style of the house built by Mixer, had been usual in Boston for ten years past or more, and that, when Mixer built his house, there were several other houses on the same street, and on other parts of the Back Bay lands, already built on lands subject to the same stipulations as those affecting Mixer's lot, which projected as far, and in some cases farther, into the reserved space than his did.

The case was reserved by *Chapman*, C. J., on the pleadings, agreed facts and evidence taken, for the determination of the full court.

*H. G. Parker*, for the plaintiffs.

*D. S. Richardson*, for the defendants Mixer and Crafts. The defendants have not violated the terms of the deeds from the Commonwealth; the projection built by Mixer was a " usual projection," a bay window, such as had been used for more than ten years in Boston. The deeds given since January 28, 1863, do not limit the extent of the usual projections which might be erected under former deeds, but they do bind the Commonwealth as an admission that such projections were " usual projections."

The right to have the house altered, if it ever existed, has been lost to all parties by the laches and negligence of the commissioners and the Commonwealth. The principle that the Commonwealth cannot be guilty of laches applies only when laches are set up against the Commonwealth; in this suit the Commonwealth has no interest. The statute under which this bill is brought expressly submits the cases under it to proceedings in equity, with the intention that the equities, laches and all, shall be fully considered as well against the Commonwealth as against individuals. The doings of the Commonwealth in the nature of laches may be considered as a waiver of its rights.

The St. of 1866, *c.* 264, under which this bill is brought, does not apply to deeds given and buildings completed before its passage. *Thompson* v. *Burnham*, 13 Gray, 214. *Whitman* v. *Hapgood*, 10 Mass. 439. *Somerset* v. *Dighton*, 12 Mass. 383. *King* v. *Tirrell*, 2 Gray, 331. If the act does apply to such deeds and buildings, it is unconstitutional, for it seeks to create a new right in other parties against the grantees under the deeds, and destroys the vested rights of the defendants, because the house was completed, the commissioners had voted that it was inexpedient to take action in relation to it, and Mrs. Crafts had taken a deed of it, and was occupying it, six months before the act passed, and had gained a vested right to maintain it, certainly against everybody except the Commonwealth.

The plaintiffs have lost all claim to equitable relief by their own laches. *Parker* v. *Nightingale*, 6 Allen, 341. *Whitney* v. *Union Railway Co.* 11 Gray, 367.

The plaintiffs cannot maintain a bill under the St. of 1866, *c.* 264, without joining "all grantees" under the deeds having the same stipulations therein, in order that the court may determine whether or not the interest of all such grantees requires that structures of this kind on the Back Bay shall all be altered; or, if the act shall be construed as applying only to grantees under the same deed from the Commonwealth, they can only maintain their bill against part of the house complained of, as it is built upon land held by different deeds.

AMES, J.   Of the various defences insisted upon by the defendants, it appears to us that the first one to be considered is the denial on their part that the building erected by the defendant Mixer was constructed " in any manner and form contrary to the agreements and provisions " contained in the title deeds, or " beyond the line " fixed by those deeds ; or that he has done anything which he was not " permitted and allowed to do by the terms of said deeds."   The language of the restriction upon which the plaintiffs rely, is to this effect, " that the front wall thereof" (that is, of Mixer's building,) " on Marlborough Street, shall be set back twenty-two feet from said Marlborough Street, provided that steps, windows, porticos and other usual projections appurtenant thereto are to be allowed in said reserved space of twenty-two feet."   And the defendants claim that, in finishing the house with an octagon front, as it is called, they have adopted a mode of building which is, and for many years has been, in very general use in Boston ; and that, as it is mainly intended to give some important advantages in the way of increased light and air, their front wall as it now stands comes within the description of " usual projections appurtenant " to windows.   But, with every disposition on our part to give to the terms of the title deeds a liberal, rather than a narrow and technical construction, we find it wholly impossible to adopt the defendants' interpretation of the stipulation as to the reserved space, without reducing it to a mere nullity.   It is manifest, on inspection of the plans and drawings, that substantially the whole of the front wall of the defendants' house, from the foundation to the roof, encroaches upon, and occupies a large portion of the reserved space.   It would be a mere abuse of language to describe so manifest an invasion of the forbidden ground as one of the " usual projections appurtenant " to windows.

Another ground of defence is, that, even upon the assumption that the conditions of the title deeds have not been complied with, yet the plaintiffs have lost all claim to equitable relief by their own laches; that they saw in what way the defendant Mixer was erecting his front wall, and suffered him to go on expending a large amount of money upon it, without attempt-

ing to interrupt his proceedings and bring the rightfulness of his claim to an early test, by filing their bill in equity; that they did not even give notice in any less formal manner of their objection to his mode of building; and that it would be contrary to equity and good conscience, now that the house is finished, to insist that it be torn down or mutilated. But it is not controverted that, at a very early stage in the proceedings, and in fact as soon as the intended shape and position of the front wall were indicated, distinct notice was given to the architect who superintended and directed the work for Mixer, that "he was infringing upon the terms and stipulations of the deed," by building in that manner, and that the plaintiffs would use all the means in their power to resist it. Mixer himself, in his deposition, admits that something was said to him, soon after the work was begun, about its being in violation of the restrictions in his deed, but that he did not understand that there were any "serious objections." We certainly see nothing in the case from which actual consent, or even passive acquiescence, on the part of the plaintiffs, could fairly be inferred. They aver in their bill, that in May 1865, when the foundation of the wall was laid, they applied to the commissioners on public lands to enforce the condition; and the commissioners in their answer admit that they did so; and although nothing came of their application, except a general assurance that they should be protected in their rights, it may well be that the plaintiffs expected, at least for a time, that the commissioners would take some action in their behalf. We cannot lose sight of the fact that, in building as he did, Mixer was acting under a claim of right. He did not ask their consent, and does not appear to have troubled himself to inquire whether they assented or objected to his mode of proceeding. He undertook to carry out his own interpretation of his title deeds, and to reject and repel their interpretation. He saw fit deliberately to proceed and build upon the reserved land, and denies that his neighbors have any right to object or complain. It was no part of his right to compel them to resort to legal process to restrain his operations *in limine.* He is not in a position to say that he had

any reason to suppose that they consented to his operations, or that he has been misled, or is taken by surprise, by finding that they deny his right to build as he has built. We think that under the circumstances their delay to file their bill in equity is sufficiently explained and accounted for, by the fact that they had applied to the commissioners for relief, and had a right to expect from them a decision upon the question submitted. It is true that "it would be contrary to equity and good conscience to suffer a party to lie by, and see acts done, involving risk and expense, by others, and then permit him to enforce his rights, and thereby inflict loss and damage on parties acting in good faith." This is all that we understand to be meant by the remark of the court in the case of *Whitney* v. *Union Railway Co.* 11 Gray, 359, 367, to the effect that the "suit in equity" in such cases, "must be seasonably commenced, before the persons in possession of the estate have expended money or incurred liabilities in erecting buildings or other structures on the premises." It is quite enough that the circumstances show that there was no laches on the part of the plaintiffs. In our judgment, Mixer had no reason to suppose that his proceedings were assented to; and the other defendant, Crafts, admits that she purchased the estate with full knowledge of all the facts, and with a bond from Mixer to indemnify her against loss.

As to the objection of the omission of parties who ought to have joined as plaintiffs, or to have been joined as defendants, in the suit, there is nothing in the St. of 1866, *c.* 264, which requires all the grantees of the Back Bay lands, under similar deeds, to unite, and proceed collectively, by a single suit in equity, in order to enforce the conditions of their united title deeds. If the purchasers were numerous, (as in this case they are,) a remedy which could only be made use of by their unanimous consent would be of but little value. In saying that "all grantees under such deeds shall have the right" to proceed in equity, the statute evidently means to give a beneficial remedy to each one, to be resorted to or not, at his option, and not requiring the concurrence of other persons, who may perhaps not incline to join him. It may be also that there are other pur-

chasers of lands in the same part of the city, whose position is very much like that of these defendants, and who may be greatly interested, so far as their feelings are concerned, in the result of this controversy; but we do not see that there are any whose rights will be directly and immediately brought in question, in the present suit, or who will be bound and directly affected by any decree which can be entered in it, except the plaintiffs and the present defendants. The objection of nonjoinder therefore does not appear to us to be of any weight.

The learned counsel for the defendants insists that the statute above mentioned cannot be made to apply to the case at bar, without giving to it a retroactive operation, which would be unjust and contrary to the letter and spirit of the Constitution. He assumes that the case depends upon that statute, and insists that, in order to have any standing in court, the plaintiffs must rely upon it, although it was not enacted until many months after the transactions that are objected to had occurred. The statute of course could not be so applied as to convert an act, which was rightful or permissible at the time of its occurrence, into a trespass or tort which should furnish a foundation for a civil action at law or a suit in equity. But we think it a very great mistake to suppose that the plaintiffs' rights depend upon, or are very greatly modified by, that statute. The most that can be said of it is, not that it creates the right, or defines any new wrong, but that it gives an additional remedy. Its true interpretation, as we think, is, that in the case of grantees of the Commonwealth land on the Back Bay (the only case to which it applies at all) all such grantees may by proceedings in equity compel the commissioners to enter, and remove or alter, all buildings that have been erected in violation of the conditions of a deed from the Commonwealth. It is only so far as it affects the commissioners, that the present bill can be said to depend upon this recent statute. The statute leaves wholly untouched he question of the rights of such grantees as against each other, which is the main question in the case.

Upon the question whether there nas been such a violation of the plaintiffs' rights as to entitle them to relief in equity, there

is no room for doubt. It is impossible, in our judgment, to see why the case does not fall exactly within the rule so distinctly laid down in several cases that have recently been before the court. *Whitney* v. *Union Railway Co. ubi supra. Parker* v. *Nightingale*, 6 Allen, 341. *Schwoerer* v. *Boylston Market Association*, 99 Mass. 285. The defendant Mixer, in purchasing his lot, did not acquire the absolute and unqualified dominion over it. On the contrary, in his case, as well as that of the purchasers generally, it was a part of the title which he accepted, that he should be limited in the use of the land in some very important particulars. Any purchaser was at liberty to build or not as he pleased, but, if he saw fit to erect a building upon his lot, he was strictly limited as to its height, its position, and its use. These conditions were imposed upon the original grants by the Commonwealth, not because their observance would be of any particular advantage or consequence to the grantors, but because they were beneficial to the grantees. Their obvious tendency and purpose were to secure certain manifest advantages to the lots that were for sale, and, by adding to their attractiveness and value, to enhance their market price. It may well be supposed that the buyers attached some importance to these conditions, and paid their money in the faith that they would be enforced. In violating the conditions, and erecting his house on the reserved space, we think that Mixer went beyond his rights, and outside of the limits of his title, as plainly as if he had inclosed a portion of the sidewalk, or erected a fence across the street. He did an act that was contrary to the express language of his title deed, and that was injurious to the plaintiffs. It was an act which could no more be justified or excused by any waiver, or even by any formal or written consent, on the part of the commissioners, or of the grantors, than the discontinuance of the street, or the inclosure of a portion of the sidewalk. The commissioners may undoubtedly adopt any definition of the term " usual projections " that they may see fit, as to future conveyances, but they cannot alter deeds already given, or take back rights which such deeds have created.

It was suggested in the argument that the condition as to the

reserved space has been so generally disregarded in practice, and that front walls like that of the defendants have been so common, that the decision of the court in the case at bar will lead to very great inconvenience and embarrassment. It may be that many grantees have misunderstood or exceeded their rights, and it may also have happened that in many cases the inconvenience that is apprehended has been cured or prevented by previous consent, or subsequent acquiescence. But however that may be, we can only administer the law as we find it to be, in the cases which we are called upon to determine.

Our conclusion, therefore, is, that the plaintiffs are entitled to relief as prayed for; and the case is to be sent to a master to consider and report in what form and manner the relief can be given with the least detriment to all parties in interest.