THOMAS ALLEN & others *vs.* MASSACHUSETTS BONDING AND INSURANCE COMPANY.

Suffolk.   December 5, 6, 1923. — April 7, 1924.

Present: RUGG, C.J., BRALEY, CROSBY, & CARROLL, JJ.

*Equitable Restriction,* Depth of cellar.   *Equity Jurisdiction,* To restrain infringement of equitable easement.

Upon findings by a master in a suit in equity by the owners of certain parcels of land in the Back Bay district, so called, of Boston, who had derived their title through mesne conveyances or by deeds from the Commonwealth, executed and delivered in accordance with appropriate legislation, against the owner of another lot in the same district, who had received title by mesne conveyance from the same grantor, to enforce a restriction in the deeds preventing the erection on the land of a building so constructed that its cellar or lower floor will be placed " more than four feet below the level of the Mill Dam, as fixed by the top surface of the hammered stone at the southeasterly corner of the emptying sluices," it was *held,* that
   (1) Such restriction was a part of the general scheme for the development of the district and was inserted for the benefit of all purchasers from the Commonwealth and their successors in title and not for the Commonwealth alone;
   (2) The rights of the plaintiff to enjoin violation of the restriction were not affected by St. 1913, c. 579;
   (3) The general character of the district had not changed to such an extent as to warrant the violation of the restriction;

(4) Certain violations of the restrictions, of which the plaintiff had no knowledge and as to which he had not been put upon notice, were not of a character to bar the relief sought by the plaintiff;

(5) While the restriction as to depth of cellar or lower floor may have been inserted in the deeds in part for purposes of sanitation, it could not be inferred that such was its sole purpose;

(6) There had been no change wrought in the drainage of the Back Bay district such as to render such restriction no longer of any avail;

(7) The great increment in the value of the land of the defendant which would arise from a refusal to enforce the restriction was of slight if any consequence in determining the suit on its merits.

BILL IN EQUITY, filed in the Supreme Judicial Court on June 12, 1923, by the owner of land in the Back Bay district, so called, in Boston, to enjoin the defendant, the owner of another lot of land in that district, from an alleged violation of an equitable restriction relating to the depth of excavation for a cellar under buildings in the district.

The suit was referred to a master. Material facts found by the master are described in the opinion. Both parties filed exceptions to the report. The suit was reserved by *DeCourcy,* J., for determination by the full court upon the pleadings, the master's report, and the exceptions thereto.

*R. Homans,* (*F. Adams* with him,) for the plaintiff.

*F. W. Knowlton,* (*S. B. Ecker* with him,) for the defendant.

*A. P. Loring & J. Noble,* by leave of court, filed a brief as *amici curiæ.*

RUGG, C.J. This is a suit in equity to prevent, by the enforcement of an alleged restriction, the erection on land of the defendant of a building so constructed that its cellar or lower floor will be placed " more than four feet below the level of the Mill Dam, as fixed by the top surface of the hammered stone at the southeasterly corner of the emptying sluices." These words are quoted from deeds from the Commonwealth as grantor under which through mesne conveyances the plaintiffs and the defendant claim their titles. Translated into modern terms the grade thus established is twelve feet above mean low water in Boston harbor and is about the mean of high tides.

The parcels of land of the several parties are within the Back Bay district of Boston. The part of that district with

which the present case is concerned comprises an area lying between and including Arlington Street on the east and Exeter Street on the west and the south side of Beacon Street and the north side of Boylston Street on the north and south respectively. The entire Back Bay district was originally tidal flats used for mill purposes. The title to a portion of these flats was in the Commonwealth. On account of house drainage from surrounding territory, the condition of these flats had become a nuisance by 1850. It was determined by filling to render them available for building purposes and thus a source of profit to the Commonwealth and to abate a nuisance. Agents of the Commonwealth were appointed, pursuant to appropriate legislation, with power to lay out and fill the Back Bay and sell it in lots for building purposes. The dominant design was to provide an attractive neighborhood for dwelling houses, then regarded as a pressing need, to convert a " waste of water into a magnificent system of streets and squares " with a central avenue having a middle portion devoted to ornamental gardening and æsthetic adornment, and to make an adequate system of drainage, recognized as " by far the most perplexing and most important question." The streets were filled to a grade of eighteen feet above mean low water and the rest of the area to a grade of twelve feet above the same level. When the Back Bay had been laid out and filled, the Commonwealth began making sales of lots of land, the first being in 1857. The original deeds from the Commonwealth under which the defendant derives title contained the provision that " This conveyance is made upon the following stipulations and agreement." Then follow regulative restrictions as to the minimum height of any building erected on the premises, as to its use, as to its setback from the street line and projection into the reserved space, as to the filling and grading of the streets by the Commonwealth, as to the maximum depth of the cellar or lower floor already quoted, as to the laying out, filling and maintenance of a passageway in the rear and an agreement by the Commonwealth to construct a sewer in such passageway and to assess the cost on the abutters. The deeds of lots on the central avenue of

the Back Bay, called Commonwealth Avenue, and the deeds of three or four other lots contained the restriction that no building erected thereon should be used for any mercantile purpose in addition to restrictions against use for mechanical or manufacturing purposes which were in all other deeds. The setback from the street line required in the deeds of lots on Commonwealth Avenue was twenty feet and in deeds of other lots twenty-two feet. With these exceptions and with some variations not here material, all the deeds of land in the Back Bay district contained substantially the same stipulations and agreement as the original deed through which the defendant claims title, save that after 1863 new and more specific provisions were inserted as to permissible projections in the reserved space between the building and the street. All the deeds contain the same or substantially the same words quoted in the first sentence of this opinion as to the depth of cellars or lower floors. The streets and sewers were built as indicated by the deeds, buildings were erected and the entire plan of development was carried out.

The master in his report gives a full account of the Back Bay sewerage system and its development. When the flats were filled, the system was a series of main drains emptying into the Charles River, generally at flat grade and of such size as to afford some storage. These main drains were made of brick and wood and tile, running at right angles to Beacon Street and following street lines, a main in every other street. The east to west sewers, flowing into the main drains, were generally laid in the passageways, constructed of pipe, and took ground and surface water as well as house drainage. These were not tight. The house drains were often of pipe but many were of wood, brick and slate. When the tide was above the level of the sewer outlet, there was no discharge until the level of the water in the sewer by storage and backing up exceeded the height of the tide. There were then no entirely effective devices to prevent back flow into the houses. Subsequent to the time when the scheme for development of the Back Bay district was devised and all the sales made by the Commonwealth, a sup-

plementary system of drainage for it has been planned and installed, consisting in part of intercepting main sewers and in part of a marginal conduit in connection with the Charles River basin. Notwithstanding these improvements, during heavy rains water still backs up into the old mains and through the leaks in them into the filled area and there mingles with the ground water. In such case house sewage to some extent will be mingled with the drain water.

There have been developed, since the creation of these stipulations, methods of waterproofing single and separate cellars so as to make them impervious to water regardless of their depth, and pumps whereby sewage and drainage from the bottom of such deep cellars may be lifted to the level of the street sewers and discharged into them.

The master has found as inferences from the other facts found by him and stated in his report that " (a) The stipulations and agreement contained in the deeds by the Commonwealth were adopted by the Commonwealth as a part of a general scheme for the development and improvement of its Back Bay lands and for the sale of those lands to purchasers at enhanced prices. (b) The stipulation ' that no cellar or lower floor of any building shall be placed more than four feet below the level of the Mill Dam, as fixed by the top surface of the hammered stone at the southeasterly corner of the emptying sluices ' was a part of such general scheme. (c) The stipulation in regard to depth of cellars just quoted was inserted for the benefit of the persons purchasing land from the Commonwealth, and those holding under them, and not solely for the benefit of the Commonwealth."

So far as these are matters of fact, they are settled by these findings. *Hano* v. *Bigelow,* 155 Mass. 341, 343. *Bacon* v. *Sandberg,* 179 Mass. 396, 398. If and so far as they are subject to review by us, we draw the same inferences from the facts set forth in the report. So far as they are matters of law, it is a necessary implication from all the facts in the master's report that the stipulation as to the depth of cellar or lower floor, already quoted and inserted in the deeds through which the defendant holds title and here

sought to be enforced, was a part of a general scheme. The Commonwealth in laying out the Back Bay acted both as proprietor of land, which it held and might sell as an individual might, and as the sovereign possessing power to lay out highways and construct sewers for the benefit of the public.

The inquiry in this respect is to ascertain the intention of the parties in executing and accepting the deeds. That intention is to be found in the words used interpreted in the light of all the material circumstances and the pertinent facts known to the parties. A servitude over one parcel of land for the benefit of another can be established only when it appears to have been the intention of the grantor by inserting in his deed words of restriction to create a right inuring to the benefit of another parcel of land and to be annexed to it as an appurtenance. *Bessey* v. *Ollman,* 242 Mass. 89, 91, and cases there cited.

It is plain that there was on the part of the Commonwealth a general scheme of real estate development of considerable magnitude as to the Back Bay district. It covered a large area. It was designed to create an attractive neighborhood given over in general to residential uses. Purchasers of lots in this district hardly could have been attracted for establishing fine homes unless assured of a proprietary right to insist that their neighbors conform to the same restrictions by which they were themselves bound. The Commonwealth must have expended large sums of money to fill the streets and the rest of the land to the required grade. The period of selling lots extended over about twenty-two years and resulted in a net revenue to the Commonwealth of several million dollars. During all this time conveyances by the Commonwealth were in substantially the same form as to stipulations and agreement. The words as to depth of cellars already quoted and here sought to be enforced were identical in all the deeds. All the restrictions in the deeds, including the one as to depth of cellars, are grouped under the single descriptive word " stipulations." Those forbidding the erection of buildings for mechanical and manufacturing purposes have obvious

relation to the benefit of the other lots. The same is true of the setbacks from street lines and projections into the reserved spaces. Such stipulations often have been held to be true equitable restrictions enforcible by other owners tracing their titles to a common grantor by whom the same general scheme was established. The stipulation as to depth of cellars or lower floors already quoted is of the same nature. It falls under the same group and general description in the deeds. It has an apparent relation to the welfare of the neighborhood. It is fairly inferable from the master's report that the stipulation as to depth of cellars or lower floors was originally essential in order to make possible an effective system of gravity drainage reasonably free from the backset into the cellars and lower floors of foul and deleterious matter due to floods and high tides. It is manifestly for the benefit of a group of buildings that in none of them shall the cellars or lower floors be filled with foul matter. That is not mentioned in any of the deeds as the reason or one of the reasons for the insertion of this particular stipulation. There may have been other purposes for its presence in the deeds. At all events there is no presumption that this was the only aim of that restriction. It is in the same category with all the others. It stands on the same footing with them. The conclusion is irresistible that this restriction as to depth of cellar or lower floor was a part of the general scheme and was inserted for the benefit of all purchasers from the Commonwealth and their successors in title and not for the Commonwealth alone. It is not necessary to recite further facts from the master's report. Taken together they show that the case at bar upon this point falls within the rule of numerous authorities and is indistinguishable from them. *Linzee* v. *Mixer,* 101 Mass. 512. *Whitney* v. *Union Railway,* 11 Gray, 359, 365. *Parker* v. *Nightingale,* 6 Allen, 341. *Attorney General* v. *Gardiner,* 117 Mass. 492. *Wilson* v. *Massachusetts Institute of Technology,* 188 Mass. 565, 568. *Evans* v. *Foss,* 194 Mass. 513. *Codman* v. *Bradley,* 201 Mass. 361. *Stewart* v. *Finkelstone,* 206 Mass. 28. *Allen* v. *Barrett,* 213 Mass. 36. The present case is distinguishable from *Beals* v. *Case,* 138 Mass. 138,

which related to a restriction inserted in some but not common to all the deeds. It is unlike *Hamlen* v. *Keith*, 171 Mass. 77, where no restriction was found to have been created of the nature sought there to be enforced.

It follows that since it was the intention of the Commonwealth to create an equitable restriction, the rights of the plaintiffs in the present proceeding are not affected by St. 1913, c. 579, whereby the rights of the Commonwealth in the cellar depth restriction as to the lot here in question were released. That release was expressly made subject to the rights, if any, of other parties. *Goulding* v. *Phinney*, 234 Mass. 411, 413. *Hopkins* v. *Smith*, 162 Mass. 444, 448. *Ivarson* v. *Mulvey*, 179 Mass. 141.

The facts reported by the master do not warrant a denial of equitable relief to the plaintiffs. The Back Bay district was originally and has remained a residential neighborhood, the character of which has not changed since the houses were first built, with these exceptions: The north side of Boylston Street has been given over entirely to business, only a single residence remaining; on Newbury Street some fifteen or twenty residences have been altered into shops and picture galleries and there are some lodging houses; on Commonwealth Avenue there is one tall apartment house, three or four clubs and a number of buildings altered into doctors' offices; and on Arlington Street there are several shops and a club. When the extent of the area included within the scheme of Back Bay development is considered, plainly the general character of the district has not been changed. *Evans* v. *Foss*, 194 Mass. 513, 518. *Codman* v. *Bradley*, 201 Mass. 361, 369. *Bacon* v. *Onset Bay Grove Association*, 241 Mass. 417.

The breaches of the cellar restriction outside of Boylston Street have been limited to two or three instances. There was no evidence that the plaintiffs knew of any of these save one. There was no evidence that any of them were sufficiently close to any of the properties owned by the plaintiffs to cause them to notice such infringements or to suffer inconvenience. Infringements of that nature do not bar equitable relief. *Payson* v. *Burnham*, 141 Mass. 547,

556. *Stewart* v. *Finkelstone*, 206 Mass. 28. *Goulding* v. *Phinney*, 234 Mass. 411. *Wilson* v. *Middlesex Co.* 244 Mass. 224.

While, as already pointed out, the restriction as to depth of cellar or lower floor may have been inserted in the deeds in part for purposes of sanitation, it cannot be inferred that that was its sole purpose. It may have had relation to the general plan of grading of the district. All the houses in the district are built on piles, which must be covered with water to prevent rotting. The only water available is the ground water which percolates through the filled area. Although the master found that its level would not be affected by building cellars below the restricted level, that finding depends wholly, so far as evidence is shown, upon opinion testimony. It would be a considerable stretch to refuse to enforce a definite right such as here is established on such ground. It was deemed necessary when the marginal conduit was constructed in connection with the Charles River dam to take measures by siphons to maintain the level of the ground water.

There has been no change wrought in the drainage of the Back Bay such as to render no longer of any avail the restriction here in question. There has been improvement, but the master's report does not show that the restriction is no longer a genuine protection to the neighborhood. This restriction may have been intended to serve in general as a limitation upon the character and size of the buildings to be erected on the several lots to the extent that as a practical matter it would operate in that direction.

It is apparent from the master's report as a whole, without narrating its findings in further detail, that the neighborhood still possesses the same general character as that established when the restrictions were inserted in the deeds. This particular restriction has not become archaic or useless either by changed conditions or by improvements in the art of drainage, plumbing or building. It still is possible to carry out the purposes of the restriction by its enforcement.

The case at bar is distinguishable from *Jackson* v. *Stevenson*, 156 Mass. 496, *Baptist Social Union* v. *Boston Uni-*

*versity,* 183 Mass. 202, and *McArthur* v. *Hood Rubber Co.* 221 Mass. 372, where the neighborhood had so utterly changed as to render no longer possible the accomplishment of the purposes of the restrictions or as to make plain that the restrictions had lost all vitality, and from *Loud* v. *Pendergast,* 206 Mass. 122, where all the landowners had so conducted themselves as to indicate an abandonment of their right to enforce the restriction.

The great increment in the value of the land of the defendant which will arise from refusal to enforce this restriction is of slight if any consequence. The restriction was matter of record in the chain of the defendant's title and the defendant was bound by notice thereof. *Riley* v. *Barron,* 227 Mass. 325. *Powers* v. *Radding,* 225 Mass. 110.

It follows that a decree may be entered enjoining the defendant from constructing any building on its parcel of land described in the bill in violation of the stipulations contained in the deeds from the Commonwealth to its predecessors in title. *Riverbank Improvement Co.* v. *Chadwick,* 228 Mass. 242. *Mahon* v. *Tully,* 245 Mass. 571. *Peck* v. *Conway,* 119 Mass. 546. *Stewart* v. *Finkelstone,* 206 Mass. 28.

*So ordered.*