# OPINION OF THE JUSTICES.

OPINION OF THE JUSTICES TO THE GOVERNOR AND COUNCIL.

*Massachusetts Turnpike Authority. Constitutional Law,* Delegation of powers, Eminent domain, Highways, Public purpose, Opinions of the Justices. *Eminent Domain,* Authority for taking, Validity of taking, Purpose of taking. *Way,* Public: what constitutes, toll express highway, Massachusetts Turnpike. *Words,* "Turnpike."

Art. 10 of the Declaration of Rights, apart from the last sentence added by art. 39 of the Amendments, would permit the legislative delegation of the power of eminent domain made by St. 1952, c. 354, to the Massachusetts Turnpike Authority without specification in the statute of the lands to be taken. [718–719]

The restrictions and limitations in the last sentence of art. 10 of the Declaration of Rights, added by art. 39 of the Amendments, apply only where the Legislature authorizes the taking of "more land and property than are needed for the actual construction of" a highway, and do not limit the power possessed by the Legislature before such amendment to delegate the right of eminent domain for the purposes of highways. [721]

Not only the worked portion of the Massachusetts Turnpike, a toll express highway authorized by St. 1952, c. 354, to be constructed and operated by the Massachusetts Turnpike Authority, but also garages, service stations, restaurants and other auxiliary buildings and structures necessary to the operation of the turnpike, together with a reasonable amount of land on which to place them, and "abutting property to preserve and protect the turnpike," are all "needed for the actual construction of" the turnpike, so that land taken for such auxiliary purposes is not "more land and property than are" so needed; and the Legislature, under the power of delegation which it possessed before the amendment to art. 10 of the Declaration of Rights by art. 39 of the Amendments, and still possesses, has validly authorized by the 1952 statute reasonable takings for such auxiliary purposes by the Authority without specification in the statute of the lands to be taken. [723, 725]

The provisions in § 5 (f) of St. 1952, c. 354, for the leasing by the Massachusetts Turnpike Authority of "gasoline stations, restaurants and other services" located on land taken by the Authority by eminent domain are not unconstitutional since the property leased will be devoted to the public purpose of the turnpike. [724]

The Justices cannot be required under Part II, c. 3, art. 2, of the Constitution to give an answer to a question submitted as to whether an entire act is constitutional in every part without having their attention directed by the question to the particular parts as to which doubts have arisen.  [727]

On June 12, 1953, the Justices submitted the following answers to questions propounded to them by the Governor and Council.

To His Excellency the Governor and The Honorable Council of the Commonwealth of Massachusetts:

The Justices of the Supreme Judicial Court respectfully submit these answers to the questions contained in your order adopted May 21, 1953, and transmitted to us May 25, 1953.  A copy of the order and of chapter 354 of the Acts of 1952, to which the order refers, are attached hereto.

For a proper understanding of the questions and of our answers it is necessary to keep in mind the general nature and certain outstanding features of the statute which has given rise to the doubts expressed in the order.  The purpose of the statute, as stated in its title, is "the construction, maintenance, repair and operation of a self-liquidating express highway from a point in the vicinity of the city of Boston to a point at or near the New York State line."  To accomplish this purpose the statute sets up as "a public instrumentality" a body politic and corporate to be known as the Massachusetts Turnpike Authority to consist of three members to be appointed by the Governor with the advice and consent of the Council.  § 3.  The authority is authorized and empowered to construct, maintain, repair, and operate the proposed highway as a toll express highway, to be known as the Massachusetts Turnpike, between the termini as stated in the title and at such location as may be approved by the State department of public works, and to finance the turnpike by issuing bonds of the authority payable solely from revenues of the turnpike.  § 1.  § 5 (g).  § 8.  § 16.  Great care is taken to make clear that neither the credit of the Commonwealth nor that of any of its political subdivisions is pledged for payment of the bonds.

§ 2. The authority is authorized, among other things, to designate the locations and to establish, limit, and control the points of ingress to and egress from the turnpike and to prohibit entrance from points not so designated (§ 5 [1]); and to fix and collect tolls for the use of the turnpike and the different parts or sections thereof. § 10. Under the head of "Incidental Powers" it is further authorized to construct grade separations at intersections; to reconstruct any public highway the location of which it shall find it necessary to change; to vacate or relocate in the manner provided by law any public highway affected by the construction of the turnpike; to enter upon lands, waters, and premises for the purpose of surveys, soundings, drillings, and examinations, making reimbursement for any actual damage resulting therefrom; to make reasonable regulations, including the granting of easements for public utilities and pipe lines, and to order their relocation or removal; to sell or remove buildings or other structures upon lands taken; and to place and maintain or grant permission or easements for ducts, pipes, pipe lines, wires or other structures, and to contract for such permission. § 7. It is further provided that the authority shall, when practicable, sell or, if not practicable, shall lease, if a lease be practicable, property taken or purchased and no longer needed. § 7. When all of the bonds shall have been paid or payment provided for, the turnpike is to become part of the State highway system, and the authority is to be dissolved. § 17.

In addition to the provisions of the statute to which reference has been made certain other provisions are so immediately related to the questions and answers that it seems advisable either to quote from them or to summarize them in greater detail. Thus by § 4 (b) the word "turnpike" is defined as including not only "the express toll highway," or such parts thereof as may be constructed under the act, but also "all bridges, tunnels, overpasses, underpasses, interchanges, entrance plazas, approaches, connecting highways, service stations, restaurants and administration, storage and other buildings and facilities which

the Authority may deem necessary for the operation of the turnpike." By § 5 (f) the authority is authorized "To acquire sites abutting on the turnpike and to construct or contract for the construction of buildings and appurtenances for gasoline stations, restaurants and other services and to lease the same for the above purposes in such manner and under such terms as it may determine." By § 5 (k) the authority is authorized "To acquire in the name of the Authority by purchase or otherwise, on such terms and conditions and in such manner as it may deem proper, or by the exercise of the power of eminent domain in accordance with the provisions of chapter seventy-nine of the General Laws . . . any fee simple absolute or any lesser interest in such private property as it may deem necessary for carrying out the provisions of this act, including any fee simple absolute in, easements upon, or the benefit of restrictions upon, abutting property to preserve and protect the turnpike . . . ." By § 10 the authority is authorized "to contract with any person, partnership, association or corporation desiring the use of any part thereof, including the right-of-way adjoining the paved portion, for placing thereon telephone, telegraph, electric light or power lines, gas stations, garages and restaurants, or for any other purpose except for tracks for railroad or railway use, and to fix the terms, conditions, rents and rates of charges for such use." Section 20 reads as follows: "The provisions of this act are severable, and if any of its provisions shall be held unconstitutional by any court of competent jurisdiction, the decision of such court shall not affect or impair any of the remaining provisions."

The questions contained in the order are these:

"1. Is the general grant of powers to the Massachusetts Turnpike Authority, as set forth in Sections 1, 5 and 7 of Chapter 354 of the Acts of 1952, a constitutional delegation of authority by the General Court?

"2. Does paragraph (f) of said Section 5 providing for the acquisition of 'sites abutting on the turnpike' for the

purposes therein set forth, or paragraph (k) providing for
the acquisition by eminent domain of 'any fee simple
absolute or any lesser interest in such private property as
it may deem necessary for carrying out the provisions of
this act, including any fee simple absolute in, easements
upon, or the benefit of restrictions upon, abutting property
to preserve and protect the turnpike,' contravene any pro-
vision of Article X of Part the First of the Constitution
of the Commonwealth?

"3. If there is any unconstitutional delegation of certain
powers to the Massachusetts Turnpike Authority by the
General Court, would such unconstitutional delegation
render said Chapter 354 of the Acts of 1952 unconstitu-
tional in its entirety, in view of Section 20 of said Chapter
354?

"4. Is Chapter 354 of the Acts of 1952 a constitutional
exercise of legislative power?"

The doubts which inspired these questions seem to have
arisen chiefly, if not wholly, because of the language of
art. 10 of the Declaration of Rights as amended by the
addition of the last sentence by art. 39 of the Amendments.
Article 10 as amended reads, "Each individual of the
society has a right to be protected by it in the enjoyment of
his life, liberty and property, according to standing laws.
He is obliged, consequently, to contribute his share to the
expense of this protection; to give his personal service, or
an equivalent, when necessary: but no part of the property
of any individual can, with justice, be taken from him, or
applied to public uses, without his own consent, or that of
the representative body of the people. In fine, the people
of this commonwealth are not controllable by any other
laws than those to which their constitutional representative
body have given their consent. And whenever the public
exigencies require that the property of any individual should
be appropriated to public uses, he shall receive a reasonable
compensation therefor. [The legislature may by special
acts for the purpose of laying out, widening or relocating

highways or streets, authorize the taking in fee by the commonwealth, or by a county, city or town, of more land and property than are needed for the actual construction of such highway or street; provided, however, that the land and property authorized to be taken are specified in the act and are no more in extent than would be sufficient for suitable building lots on both sides of such highway or street, and after so much of the land or property has been appropriated for such highway or street as is needed therefor, may authorize the sale of the remainder for value with or without suitable restrictions.]" For convenience we have set off in brackets the words added by the amendment.

Long before the amendment to art. 10 the delegation by the Legislature to counties, cities, and towns of the general power to take lands by eminent domain for the purpose of ways and other public purposes without description or specification in the enabling act of the lands to be taken had become a commonplace. It had also become recognized and fairly common practice before the subjects were covered by general laws for the Legislature to delegate to private corporations such as canal companies, turnpike companies and railroads power to exercise rights of eminent domain for the public purpose of promoting the transportation of persons and goods between termini and by routes often described with no greater particularity than is done in the statute now under consideration.[1] A railroad charter of this type came under the examination of this court in *Boston Water Power Co.* v. *Boston & Worcester Rail Road,*

---

[1] See *Opinion of the Justices,* 250 Mass. 591, 596; St. 1791, c. 57 (Massachusetts Canal); St. 1793, c. 21 (Middlesex Canal); St. 1795, c. 21 (Cumberland Canal); St. 1796, c. 5 (First Massachusetts Turnpike Corporation); St. 1796, c. 72 (Second Massachusetts Turnpike Corporation); St. 1799, c. 48 (Eighth Massachusetts Turnpike Corporation); St. 1829, c. 12 (Providence and Bristol Turnpike Corporation); St. 1829, c. 26 (Worcester Rail Road Company); St. 1829, c. 93 (Franklin Rail Road Company); St. 1829, c. 94 (Massachusetts Rail Road Corporation); St. 1829, c. 95 (Boston, Providence and Taunton Rail Road Corporation); St. 1830, c. 4 (Boston and Lowell Rail Road Corporation); St. 1831, c. 56 (Boston and Providence Rail-Road Corporation); St. 1831, c. 57 (Boston and Ontario Rail Road Corporation); St. 1832, c. 97 (Pittsfield and West Stockbridge Rail Road Company); St. 1833, c. 109 (Andover and Wilmington Rail Road Corporation); St. 1833, c. 116 (Western Rail Road Corporation). The foregoing list is not intended to be complete.

23 Pick. 360, 395–396, and the delegation of the power of eminent domain was held constitutional and valid. Other illustrations in our decisions are found in *Springfield* v. *Connecticut River Railroad*, 4 Cush. 63, 69–70, *Brigham* v. *Agricultural Branch Railroad*, 1 Allen, 316, *Fall River Iron Works Co.* v. *Old Colony & Fall River Railroad*, 5 Allen, 221, and *Housatonic Railroad* v. *Lee & Hudson Railroad*, 118 Mass. 391, 392–393. See *Boston & Providence Railroad* v. *Midland Railroad*, 1 Gray, 340; *Brayton* v. *Fall River*, 124 Mass. 95, 96–97; *Codman* v. *Crocker*, 203 Mass. 146, 154–155; *Lynch* v. *Forbes*, 161 Mass. 302, 308–309. In the present general laws applicable to railroads considerable latitude still remains in the railroad to select its route, subject to control by designated public authorities. G. L. (Ter. Ed.) c. 160, §§ 18–21, § 80.

These are simply instances falling within the recognized principle that the Legislature, having adopted a policy, may delegate the working out of the details of that policy. See *Commonwealth* v. *Hudson*, 315 Mass. 335, 341; *Scannell* v. *State Ballot Law Commission*, 324 Mass. 494, 501–502; *Treasurer of Worcester* v. *Department of Labor & Industries*, 327 Mass. 237, 241. *Springfield Institution for Savings* v. *Worcester Federal Savings & Loan Association*, 329 Mass. 184.

From what has been said we think it sufficiently appears that if art. 10 of the Declaration of Rights had not been amended by art. 39 of the Amendments in the manner indicated by the brackets inserted in the amended art. 10 as above quoted, there would be no serious question as to the power of the Legislature in general to delegate rights of eminent domain to the Massachusetts Turnpike Authority for the purpose of constructing a great highway. If such rights can be delegated to a private corporation serving the public such as a railroad or other public service corporation it would be difficult to see why art. 10, as unamended, or anything else in the Constitution, would stand in the way of a similar delegation to a public corporation like the authority the members of which are appointed by the Governor. Such delegation by the Legislature would be a suffi-

cient "consent" of "the representative body of the people" to comply with the requirement of such consent for the taking of private property contained in the second sentence of art. 10.

It next becomes necessary to examine the amendment to art. 10 added by art. 39 of the Amendments to ascertain its exact meaning in restricting or enlarging the legislative power of delegation, and this examination must be made in the light of the public exigency which called forth the amendment. *General Outdoor Advertising Co. Inc.* v. *Department of Public Works*, 289 Mass. 149, 158. *Opinion of the Justices*, 324 Mass. 746, 749.

It appears from *Opinion of the Justices*, 204 Mass. 607, and *Opinion of the Justices*, 204 Mass. 616, that in the early part of the year 1910, as a result of a report of the joint board on metropolitan improvements which had been created the preceding year, the Legislature had before it a proposal for the construction for commercial purposes of a broad street or streets in the city of Boston which involved the taking of private lands on the sides of the proposed street or streets, not as part of such street or streets or to serve any purpose of such street or streets, but solely for the purpose of division into suitable lots to be sold to private owners under conditions designed to develop the location for commerce, trade, and industry. The Justices gave their opinion that private lands could not be taken by eminent domain for the purpose of resale to other private owners with the object of promoting a commercial development in the manner proposed. The Justices advised that this would be an unconstitutional use of the power of eminent domain and of public moneys for a purpose not public in character. Article 39 of the Amendments was adopted by the Legislatures of that same year and of the year following and was approved and ratified by the people on November 7, 1911. The amendment, as hereinbefore quoted, expressly provides that the Legislature may, for the purpose of laying out, widening or relocating highways or streets, authorize the taking in fee by the Commonwealth, or by a county, city, or town, "of more land and property than are needed for the actual con-

struction of such highway or street," provided that the land and property authorized to be taken are specified in the act "and are no more in extent than would be sufficient for suitable building lots on both sides of such highway or street." The amendment further provides that the land not needed for the highway or street may be authorized to be sold with or without suitable restrictions. In our opinion the conclusion is practically inescapable that the design of this amendment was not to limit the power which the Legislature previously possessed under art. 10 to delegate the right of eminent domain but was to enlarge that power so as to allow the Legislature to do what the Justices had previously advised it could not do, that is, to authorize under certain carefully stated restrictions and limitations the taking of land not intended for purposes of the highway or street but intended for development of the locality.

It follows that the Legislature still possesses all the power of delegation held and frequently exercised by it before the amendment, and that the restrictions and limitations contained in the amendment apply only where the Legislature authorizes the taking of "more land and property than are needed for the actual construction of such highway or street." It becomes necessary therefore to determine whether by St. 1952, c. 354, the Legislature has attempted to authorize the taking of more land than is needed for the actual construction of the turnpike. If it has, since the statute does not comply with the limitations and restrictions of the amendment, the statute is invalid in so far as it relates to the taking of such additional land. And in determining whether the act does attempt to authorize the taking of more land than that needed for the turnpike we must first determine what are the component parts of the turnpike itself.

It is evident that this is to be no ordinary highway of the kind with which our history has made us familiar. It is an entirely new type of highway which has made its appearance only in comparatively recent years as a result of the many changes in the lives and customs of the people brought about

by the introduction and general use of the automobile. It will run practically the entire length of the main part of the State. It will doubtless consist of a number of paved lanes properly separated and graded to permit of safe operation at high speeds comparable perhaps to the speeds of passenger trains on railroads. It is to be expected that there will be few, if any, grade crossings. There are to be ingress and egress only at designated points, which in some instances may be miles apart. There will be signs, signals, and perhaps safety devices of one kind or another. There must be space along the sides of the main portion of the way to afford opportunity for slowing down or stopping or for disabled vehicles without interference with the general flow of traffic. In fact in some respects such a way more nearly resembles a new railroad system crossing the State than it resembles the traditional road leading from one town to another. It differs still more from the ordinary city street. Such a road cannot merely be constructed and opened to the public. It must be operated. This involves inspection, supervision, and a constant preparedness to remove obstructions and make necessary repairs. This in turn is likely to involve the use of road machinery, towing vehicles, snow plows, and sanding equipment, which must be kept in readiness and may have to be stored at proper places along the way. For all this buildings may be required, as well as a reasonable provision for garages where necessary repairs can be made both upon the equipment of the turnpike and in order to keep the vehicles of travellers in operable condition. Similarly it will be necessary to . provide gasoline stations at reasonable intervals. These auxiliary structures bear a relation to the turnpike similar to that which the switch towers, water tanks, round houses, and stations bear to a railroad. These structures are parts of the railroad, although not parts of the track.

What land is needed for the actual construction of this new type of turnpike and what forms part of it and what is outside of it are matters not to be determined by the same standards as would be applied in the case of the country

road of fifty or even of twenty-five years ago. . This enterprise must be envisioned as a whole in its larger aspects. In our opinion not only the worked portion of the roadway, including, of course, bridges, abutments, embankments and approaches, but also the kinds of buildings and other structures which we have mentioned and a reasonable amount of land taken or acquired on which to place them are all "needed for the actual construction" of the highway and are parts of it and will be taken or acquired for and devoted to a public use, and land taken for such purposes will not be "more land and property than are needed for the actual construction" of the highway. We think therefore that reasonable takings for these purposes may be authorized by the Legislature under the powers which it possessed before the amendment to art. 10 and which were not cut down by that amendment. Such takings will not be for resale to private individuals. There is involved nothing in the nature of a real estate development which the amendment was designed both to permit within limits and to regulate. The requirements of the amendment are inapplicable.

More doubt may exist as to restaurants, but on the whole, in dealing with such a highway as the proposed turnpike, we are inclined to classify them with the services previously mentioned. Undoubtedly many travellers will seek food on their way across the State. It will be a great convenience to them to find it at a place where they can park their vehicles without interfering with traffic and without the necessity of looking for an exit, searching for a restaurant, and then reëntering the turnpike. The utility of restaurants in connection with travel is attested by the facts that they have long been a customary feature in railroad stations and are now commonly found at the larger airports. The provision for restaurants may also have some tendency to reduce the amount of stopping along the route and to keep the roadway free of refuse. We think restaurants such as are provided for in the act are parts of the turnpike, and that a reasonable amount of land taken for them is land "needed for the actual construction" of the highway and is devoted to

a public use. It seems that the Legislature regarded all these auxiliary structures to which reference has been made as parts of the turnpike, since it included all of them in the definition of "turnpike" in § 4 (b) of the act, and we do not believe that the references to "sites abutting on the turnpike" in § 5 (f) and to "abutting property" in § 5 (k) were intended to narrow the previous definition. It seems obvious that what was said in *Commonwealth* v. *Morrison*, 197 Mass. 199, 205, about a lunch cart obstructing the street in Adams Square in Boston has no bearing upon the nature of a restaurant upon this turnpike as a public use of land. See also *Motoramp Garage Co.* v. *Tacoma*, 136 Wash. 589.

In reaching our conclusions we have derived some assistance from the New York cases of *Blank* v. *Browne*, 217 App. Div. (N. Y.) 624, *Anderson* v. *Taconic State Park Commission*, 262 App. Div. (N. Y.) 892, affirmed, 287 N. Y. 668, and *People* v. *La Frantz*, 188 Misc. (N. Y.) 989, dismissed for failure to prosecute appeal, 302 N. Y. 699.

The provisions in § 5 (f) of the act for the leasing by the authority of "gasoline stations, restaurants and other services" are not unconstitutional. They do not involve the taking or holding of lands for private purposes. Property leased will still be devoted to the public purpose of the turnpike, to which these services are wholly subordinate. "While land cannot ordinarily be taken by eminent domain for the purpose of renting and sale . . . this principle is inapplicable where, as here, the property so rented or sold is thereby devoted to a public purpose." *Opinion of the Justices*, 321 Mass. 766, 770. *Salisbury Land & Improvement Co.* v. *Commonwealth*, 215 Mass. 371, 377–378. *McLean* v. *Boston*, 327 Mass. 118, 121. See *Murphy* v. *Commonwealth*, 187 Mass. 361, 375; *Wright* v. *Walcott*, 238 Mass. 432, 438; *D. N. Kelley & Son, Inc.* v. *Selectmen of Fairhaven*, 294 Mass. 570, 574–575.

Neither do we think that any difficulty arises from the use of the indefinite expressions "other buildings and facilities which the Authority may deem necessary for the operation of the turnpike" in § 4 (b) of the act and "other

services" in § 5 (f). We think it clear that these expressions
are to be construed in their respective settings and that they
refer only to such buildings, facilities and services as are
reasonably necessary for the public purposes of the turn-
pike as described in the act.

The power granted in § 5 (k) to take "abutting property
to preserve and protect the turnpike" is not, we think, a
grant of power to take more land than is "needed for the
actual construction" of the highway as the words just
quoted are used in the amended art. 10 as hereinbefore
interpreted. Land really needed to preserve and protect
the turnpike is needed for its actual construction within
the meaning of art. 10. Doubtless this power to take
"abutting property" would be construed with considerable
strictness. It is not a roving commission.

We are not entirely clear as to the interpretation to be
given to the first question. Sections 1, 5, and 7 of the act,
referred to in this question, contain some provisions of such
breadth that the widest possible interpretation of the ques-
tion itself would require us to pass upon practically every
separate detailed provision contained in the act, including
provisions as to which no direct reference is made and no
doubts are expressed in the order. We do not believe this
was intended. We think that this question was designed to
ask whether the general plan or scheme of the act whereby
power is delegated to the Massachusetts Turnpike Authority
to construct the "Massachusetts Turnpike" from a point in
the vicinity of Boston to a point at or near the New York
line and to exercise rights of eminent domain for that pur-
pose, without further specification in the grant of powers of
the location of the turnpike or of the property authorized
to be taken, is constitutional without consideration of the
particular provisions of § 5 to which reference is made in
the second question or of each other particular provision of
the act. To this question, so construed, our answer is
"Yes." In dealing with this question in this manner we do
not mean to imply that we have discovered constitutional
difficulties in any part of the act to which no reference is

made in the questions or in these answers. We mean simply
to preserve the view which the Justices have taken for
many years that they cannot properly be called upon to
answer a question whether a long and complicated act is
constitutional in each and every part without having their
attention directed to the particular parts as to which doubts
have arisen. *Opinion of the Justices*, 328 Mass. 679, 691,
and citations there contained.

To the second question our answer is "No."

In view of what has been said the third question scarcely
need be answered; but a brief comment may be proper.
When a court is compelled to pass upon the constitutionality
of a statute and is obliged to declare part of it unconstitu-
tional, the court, as far as possible, will hold the remainder
to be constitutional and valid, if the parts are capable of
separation and are not so entwined that the Legislature
could not have intended that the part otherwise valid should
take effect without the invalid part. *Ashley* v. *Three Jus-
tices of the Superior Court*, 228 Mass. 63, 81. This may
sometimes involve a difficult decision. Where the statute
contains a severability clause like that embodied in § 20 of
the act here involved, this is a declaration by the Legisla-
ture that it intends to have the principle of severability
invoked wherever possible. No doubt there are many pro-
visions in St. 1952, c. 354, which are so far collateral and
ancillary to the main object of constructing the turnpike
that the provisions for accomplishing that main object could
stand even if the collateral and ancillary provisions were
invalid. Thus it would seem that the fundamental pro-
visions of the act would not be invalidated even if the pro-
vision for acquiring sites abutting on the turnpike for the
purposes mentioned in § 5 (f) were held invalid; or it might
well be held that land could be acquired for such purposes
by purchase even if it could not be acquired for such pur-
poses by eminent domain. But inasmuch as in our opinion
all provisions of the statute to which our attention has
been directed are valid it does not seem profitable to pursue
this subject further.

The fourth question asks whether c. 354 of the Acts of 1952 is constitutional without mentioning any particular parts of that statute or informing us as to the nature of any doubts concerning it. This is the sort of question which, as hereinbefore stated, the Justices feel that they are not required to answer. We have answered with considerable fullness all questions of a specific nature where our attention has been directed to the doubts intended to be resolved. We respectfully request that we may be excused from answering the fourth question.

We feel compelled to add that we have entertained serious question as to whether the order of His Excellency the Governor and the Honorable Council shows that they have such present duties to perform in connection with St. 1952, c. 354, as to make this a solemn occasion within the purview of Part II, c. 3, art. 2, of the Constitution. But in view of the statement in the order that doubts exist as to the power and authority of the executive department of the Commonwealth and the power and duty of officers under its direction to proceed to the discharge of functions assigned to them under that chapter, and in view of the possibility that because of the importance of the statute and the many ramifications connected with such an extensive enterprise as the construction of the turnpike there may well exist or soon arise problems for consideration of His Excellency the Governor and of the Honorable Council of which we are not aware, we have preferred to cast aside our own doubts as to the existence of a solemn occasion and to submit these answers. We do this, however, without intending to depart from the construction heretofore given to Part II, c. 3, art. 2, of the Constitution. See *Opinion of the Justices*, 269 Mass. 611, 618–619.

STANLEY E. QUA.
HENRY T. LUMMUS.
JAMES J. RONAN.
RAYMOND S. WILKINS.
JOHN V. SPALDING.
HAROLD P. WILLIAMS.
EDWARD A. COUNIHAN, Jr.