GERALD W. BLAKELEY, JR., & others, trustees,
*vs.* HARRY N. GORIN & others.

Suffolk.    December 4, 1973. — July 12, 1974.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Equitable Restrictions. Real Property,* Restrictions. *Equity Jurisdiction,* To enforce equitable restrictions, Specific performance. *Constitutional Law.* Public purpose, Eminent domain. *Eminent Domain,* Purpose of taking, What constitutes taking. *Boston.*

The court's refusal under G. L. c. 184, § 30, to enforce a restriction in a deed, in order to permit construction of a large apartment-hotel complex on a lot which had been vacant for ten years, was not, if a

taking, a taking of property of nearby owners for private purposes, in violation of the Fifth and Fourteenth Amendments to the Federal Constitution and article 10 of the Massachusetts Declaration of Rights, where the nearby owners are to be compensated for harm done. [595-601] QUIRICO, J., dissenting, with whom ·REARDON, J., joined.

One aspect of a decree, declaring a restriction in a deed concerning the setback of a building obsolete and unenforceable, was affirmed where the respondents made no reference to this restriction before the trial court or this court. [601-602] QUIRICO, J., dissenting, with whom REARDON, J., joined.

Construction of an apartment-hotel garage would not violate a restriction in a deed against use of a building for a stable. [602]

Use of a building for an apartment-hotel complex, with incidental use of a small portion of it for shops, would not violate a restriction in a deed against "mercantile" uses. [602-603]

Where construction of a bridge between a hotel and a proposed apartment-hotel complex over an alley would have a modest impact on the light and air available to nearby property, where numerous public authorities and zoning laws exist to determine whether and how such a bridge should be built, and where the lot for the proposed complex had been vacant for ten years and is too small to permit construction of a freestanding building to be economically feasible, specific performance of a deed restriction mandating that the alley "be kept open" would be inequitable and not in the public interest; however, the nearby owners would be entitled to damages for the loss of light and air. [603-607] QUIRICO, J., dissenting, with whom REARDON, J., joined.

BILL IN EQUITY filed in the Superior Court on July 25, 1968.

The suit was heard by *Mitchell*, J.

*John R. Hally* for Harry N. Gorin & others.

*James D. St. Clair* (*Thomas J. Sartory* with him) for Gerald W. Blakeley, Jr., & others, trustees.

*Thomas J. Crowley & Kevin Curry*, Assistant Attorneys General, for the Attorney General, amicus curiae, submitted a brief.

HENNESSEY, J.   This is an appeal from a final decree of the Superior Court in equity on a petition brought pursuant to the provisions of G. L. c. 240, § 10A. The petitioners, owners of a parcel of land subject to certain restrictions known as the Commonwealth Restrictions, seek a determi-

nation and declaration that the restrictions are obsolete and unenforceable. More specifically, they seek such relief under the terms of G. L. c. 184, § 30. After proper notice was given to owners of nearby lots pursuant to c. 240, § 10B, a hearing was held at which several of these owners appeared as respondents in opposition to the petition. The petition was taken pro confesso against each of the others and against the Commonwealth.[1] At the conclusion of the hearing the judge made findings of fact, including findings that since the imposition of the restrictions various public bodies have been given control over the basic design structure of buildings on premises subject to the restrictions, that there has been a radical change in the character of the neighborhood surrounding the petitioners' and the respondents' properties, and that as a result the restrictions are obsolete. He further found that it would be "oppressive, inequitable and not in the public interest" to give effect to the restrictions in this factual setting. Damages were found to be nominal. The final decree declared the restrictions obsolete and unenforceable and that there would be no rights to any damages.

The Commonwealth Restrictions date from the middle of the last century. By 1850 the condition of the tidal flats which composed the area now known as the Back Bay had become a nuisance, largely due to drainage problems. The Commonwealth determined to fill in the area and sell lots for dwellings, subject to restrictions in conformity with a comprehensive land use plan.

With some exceptions and minor variations the same stipulations and agreements were inserted into all the deeds to land in the Back Bay district, from the Commonwealth as grantor to various private grantees, beginning in 1857. See generally, *Attorney Gen.* v. *Gardiner*, 117 Mass. 492 (1875); *Allen* v. *Massachusetts Bonding & Ins. Co.* 248 Mass. 378 (1924).

General Laws c. 184, § 30, inserted by St. 1961, c. 448, § 1, on which the petitioners rely, provides that no restric-

---

[1] The Commonwealth reëntered the proceedings in this court as amicus curiae.

tion shall be enforced or declared to be enforceable unless it is determined that the restriction is, at the time of the proceeding, of actual and substantial benefit to a person claiming rights of enforcement. Further, even if a restriction is found to be of such benefit, it shall not be enforced except by award of money damages if any of several enumerated conditions are found to exist.[2]

The facts are as follows. The petitioners are the owners of two parcels of land separated by Public Alley No. 437; the first is known as 2, 4, 6, 8, and 10 Commonwealth Avenue and the second as 13-15 Arlington Street and 1, 3, and 5 Newbury Street. The former is presently a vacant lot; the latter is the site of the Ritz-Carlton Hotel. Both are subject to various of the Commonwealth Restrictions. The petitioners plan to build on the former lot a 285 foot high hotel-apartment building, with a twelve-story structure as a bridge over the alley, connecting it with the Ritz-Carlton. Plans call for the new building to contain such restaurant and shopping facilities as are usually incidental to the running of a large hotel, and an underground garage for off-street parking as required by the Boston Zoning Code.

The respondents are the owners of 12-14 Commonwealth Avenue, a parcel which is adjacent to the petitioners' vacant lot and backs on the same alley. This property contains an eight-story building with eight apartments on

---

[2] Those conditions are as follows: "(1) changes in the character of the properties affected or their neighborhood, in available construction materials or techniques, in access, services or facilities, in applicable public controls of land use or construction, or in any other conditions or circumstances, which reduce materially the need for the restriction or the likelihood of the restriction accomplishing its original purposes or render it obsolete or inequitable to enforce except by award of money damages, or (2) conduct of persons from time to time entitled to enforce the restriction has rendered it inequitable to enforce except by award of money damages, or (3) in case of a common scheme the land of the person claiming rights of enforcement is for any reason no longer subject to the restriction or the parcel against which rights of enforcement are claimed is not in a group of parcels still subject to the restriction and appropriate for accomplishment of its purposes, or (4) continuation of the restriction on the parcel against which enforcement is claimed or on parcels remaining in a common scheme with it or subject to like restrictions would impede reasonable use of land for purposes for which it is most suitable, and would tend to impair the growth of the neighborhood or municipality in a manner inconsistent with the public interest or to contribute to deterioration of properties or to result in decadent or substandard areas or blighted open areas, or (5) enforcement, except by award of money damages, is for any other reason inequitable or not in the public interest."

each floor except the first, half facing Commonwealth
Avenue and half the alley in back, half (the corner apart-
ments) being of two rooms and half efficiency apartments.
The thirty-two rear apartments derive their principal light
and air from one window in each apartment on the alley.

Among the restrictions contained in the original deeds to
the parcel numbered 4, 6, 8, and 10 Commonwealth Avenue
are the following: "[a] That a passageway, sixteen feet
wide, is to be laid out in the rear of the premises, the same to
be filled in by the Commonwealth, and to be kept open and
maintained by the abutters in common . . . [b] That any
building erected on the premises . . . shall not in any event
be used . . . for any . . . mercantile . . . purposes . . . [c] That
any building erected on the premises . . . shall not in any
event be used for a stable . . . [d] That no cellar or lower floor
of any building shall be placed more than four feet below
the level of the Mill Dam, as fixed by the top surface of the
hammered stone at the Southeasterly corner of the empty-
ing sluices. [e] That the front wall [of any building erected
on the premises] . . . shall be set back twenty feet . . .
provided that steps, windows, porticoes, and other usual
projections appurtenant thereto, are to be allowed in said
reserved space of twenty feet." Among the restrictions
contained in the original deed to the parcel numbered 2
Commonwealth Avenue are the same restrictions as those
applicable to the parcel numbered 4, 6, 8, and 10 Com-
monwealth Avenue except that any building constructed
thereon shall be set back from Commonwealth Avenue
twenty-two feet, rather than twenty feet as stipulated for 4,
6, 8, and 10 Commonwealth Avenue. Among the restric-
tions contained in the original deeds to the parcels num-
bered 13-15 Arlington Street and 1, 3, and 5 Newbury
Street is the following: "That a passageway, Sixteen feet
wide, is to be laid out in the rear of the premises, the same to
be filled in by the Commonwealth, and to be kept open and
maintained by the abutters in common . . . ."

We have found no error in the judge's decision that none
of these restrictions shall be enforced, except in so far as he
found that no damages shall be awarded. We note that the

most difficult aspect of this case concerns the passageway. There will be no obstruction to the movements of persons or vehicles, since the bridge between the Ritz-Carlton building and the new building will start at a point thirteen feet above the ground. Nevertheless, the bridge will occupy most of the space between the two buildings for a height of twelve stories, with consequent effect on light and air. For this reason we have determined, as discussed later in this opinion, that damages are to be awarded for loss of light and air.

Our consideration of this case first concerns itself with the issue whether G. L. c. 184, § 30, is constitutional. We have determined below that there is no merit to the respondents' claim of unconstitutionality. Thereafter, as will be seen, we proceed to a consideration of each of the five restrictions. It will also be seen that our discussion of the construction of the statute, as well as its constitutional aspects, centers on the restriction against blocking the passageway.

## CONSTITUTIONALITY.

The respondents argue briefly, almost without discussion, that G. L. c. 184, § 30, is unconstitutional or has been unconstitutionally applied. The dissenting Justices in this case conclude that the statute is unconstitutional. We believe that the statute is constitutional and was constitutionally applied here.

The dissent concludes that the result of the trial judge's decision is an unconstitutional taking of the respondents' property for private purposes. Massachusetts Declaration of Rights, art. 10. United States Constitution, Amendments 5 and 14. It is true that the settled law of this Commonwealth is that deed restrictions of this type are a property interest in land. See *Nash* v. *Eliot St. Garage Co.* 236 Mass. 176, 180 (1920); *Ward* v. *Prudential Ins. Co.* 299 Mass. 559, 564 (1938); *Belmont* v. *Massachusetts Amusement Corp.* 333 Mass. 565, 572 (1956). Nevertheless, we

believe, first, that there is no need to consider that a taking occurred in this case and, second, that even assuming there was a taking it was for a public purpose and was therefore constitutional.

While we need not decide the issue here, it is not at all clear that the operation of c. 184, § 30, in this case amounts to a taking in the constitutional sense. While G. L. c. 79, § 1, authorizes eminent domain proceedings to take "any interest" in real property, and thus a restrictive covenant may theoretically be said to be "taken," the Commonwealth here is surely not taking an interest in the ordinary sense of that word. The statute here may with equal validity be viewed not so much as affecting a taking but as altering the remedies by which such restrictions may be enforced in certain circumstances. Thirty-sixth Report of the Judicial Council (December, 1960), Pub. Doc. No. 144, pp. 80-82, reprinted in 45 Mass. L. Q. (No. 4) 1 (1960). But see *Riverbank Improvement Co.* v. *Chadwick*, 228 Mass. 242 (1917).

Equity does not invariably and automatically grant specific enforcement of such restrictions on the use of land. Cf. *Whitney* v. *Union Ry.* 11 Gray 359, 366 (1858) ("They do not restrict the alienation of land. . . . They do not tend to perpetuity. . . . They do not impair the enjoyment of the property."); *Riverbank Improvement Co.* v. *Chadwick*, 228 Mass. 242, 247 (1917) ("It has been found expressly that the enforcement of the restrictions would 'not be injurious to the public interests' "). While the usual ground for denying such enforcement in a case involving real property is laches, see *Whitney* v. *Union Ry.*, *supra*, at 367, or other inequitable conduct by the party seeking to enforce the restriction, this need not always be the case. The Restatement: Property, § 563 (1944), would deny enforcement, apparently without compensation, if the "harm done by granting the injunction will be disproportionate to the benefit secured thereby." The official comments, while suggesting that the standard be a "disproportion . . . of considerable magnitude," do not even consider the possi-

bility that such a limitation of remedies could conflict with the constitutional mandate of the taking clause.

The United States Supreme Court has never considered that every government regulation impinging directly or indirectly on property rights would constitute a "taking" of property in the constitutional sense. As long ago as 1885 Mr. Justice Gray stated in *Head* v. *Amoskeag Mfg. Co.* 113 U. S. 9, 21 (1885), that "[w]hen property, in which several persons have a common interest, cannot be fully and beneficially enjoyed in its existing condition, the law often provides a way in which they may compel one another to submit to measures necessary to secure its beneficial enjoyment, making equitable compensation to any whose control of or interest in the property is thereby modified." While the court there dealt with conflicting water rights and the opinion used partition of a joint tenancy as an example, the language is equally apposite to the situation in the present case. See also *Euclid* v. *Ambler Realty Co.* 272 U. S. 365 (1926) (zoning constitutional although it greatly decreases value of land). Just this year, in another zoning case, the Supreme Court restated the proposition of Mr. Justice Holmes that "property rights may be cut down, and to that extent taken, without pay." *Belle Terre* v. *Boraas*, 416 U. S. 1, 9-10 (1974), quoting *Block* v. *Hirsh*, 256 U. S. 135, 155 (1921).

To rule that G. L. c. 184, § 30, is unconstitutional would raise to a constitutional right the ordinary rule of equity that property interests may be enforced by a decree of specific performance. This result, by removing the discretion inherent in courts of equity to determine whether to grant specific performance, would reverse legal precedents even older than the Commonwealth Restrictions themselves. *Western R.R.* v. *Babcock*, 6 Met. 346, 352 (1843). *Lee* v. *Kirby*, 104 Mass. 420, 427-428 (1870). *Curran* v. *Holyoke Water Power Co.* 116 Mass. 90 (1874). *Thaxter* v. *Sprague*, 159 Mass. 397 (1893). *Richardson Shoe Mach. Co.* v. *Essex Mach. Co.* 207 Mass. 219 (1911). *Brockton Olympia Realty Co.* v. *Lee,* 266 Mass. 550 (1929). *Linden*

*Park Garage, Inc.* v. *Capitol Laundry Co.* 284 Mass. 454
(1933). *Exchange Realty Co.* v. *Bines*, 302 Mass. 93 (1939).
*Kaplan* v. *Bessette*, 357 Mass. 233 (1970). See generally,
Story, Equity Jurisprudence (14th ed.) § 1026 (1918).

Changes in law and circumstances since the time of the
creation of the Commonwealth Restrictions and that of
*Riverbank Improvement Co.* v. *Chadwick*, 228 Mass. 242
(1917), militate in favor of adopting the view that the
statute circumscribes remedies rather than "takes" land.
With the advent of zoning, see *Euclid* v. *Ambler Realty Co.*
272 U. S. 365 (1926), and the growth of numerous public
regulatory bodies such as those mentioned in fn. 4, *infra*,
the use of land has been controlled for the most part by
public law rather than private restrictions.

The Legislature has appropriately left the decision on
specific enforcement of these rights where it has tradi-
tionally resided, in the sound discretion of a judge of a court
of equity. It seems inappropriate to transform this dis-
cretionary remedy into a constitutional right. Nevertheless
the dissent apparently would hold that the Legislature is
powerless, even in a case where the public interest will be
served, to alter land use decisions inscribed in a deed over a
century ago by parties to a private land transaction, unless
it determines to take the land by eminent domain for a park
or highway or other comparable use.

Even assuming that c. 184, § 30, is viewed as allowing a
taking of property in this case, we believe the taking would
be constitutional. It is not necessary, for a taking of private
property to be upheld as constitutional, that the land
thereafter be devoted to a public use; it is enough if the
taking is accomplished for a public purpose. *Papadinis* v.
*Somerville*, 331 Mass. 627 (1954). *Moskow* v. *Boston
Redevelopment Authy.* 349 Mass. 553 (1965). "In such
cases the legislature, not the judiciary, is the main guard-
ian of the public needs to be served by social legislation . . ..
The role of the judiciary in determining whether . . . [the
power of eminent domain] is being exercised for a public
purpose is an extremely narrow one." *Berman* v. *Parker*,
348 U. S. 26, 32 (1954).

The statute in question here was clearly passed to promote the "reasonable use of land for purposes for which it is most suitable," c. 184, § 30 (4), as well as to increase the marketability of real estate which may be impaired by obsolete restrictions. These are proper purposes, of great benefit and utility to the public, which justify the taking of property interests of the kind at issue here. Cf. *Village on the Hill, Inc.* v. *Massachusetts Turnpike Authy.* 348 Mass. 107 (1964); *Moskow* v. *Boston Redevelopment Authy.* 349 Mass. 553 (1965). The parcel of land in question here has been vacant for over a decade. By the operation of this statute a large apartment-hotel complex may be built upon it, providing numerous benefits to the general public, not the least being its effect on the tax base. That the owner of the land may also benefit as a private party is irrelevant. If this situation constitutes a taking we cannot say it was accomplished for a purely private purpose. See, generally, Nichols, Eminent Domain (Rev. 3d ed.) c. VII (1970). Nichols, The Meaning of Public Use in the Law of Eminent Domain, 20 B. U. L. Rev. 615 (1940).

The case on which the dissent relies, *Riverbank Improvement Co.* v. *Chadwick*, 228 Mass. 242 (1917), is readily distinguishable from the present situation. The *Riverbank* case dealt with St. 1915, c. 112, a statute substantially the same as the one in issue here. The court held only that the statute was not constitutionally applied on the facts of that case. It did not consider the "constitutionality of the statute in other aspects". 228 Mass. at 249. Statute 1915, c. 112, conferred jurisdiction on the Land Court to remove equitable restrictions if their enforcement "would be inequitable or injurious to the public interests." The statute made clear elsewhere that "inequitable" and "injurious to the public interests" were independent conditions, thereby empowering the Land Court to remove an inequitable restriction even if it were not injurious to the public interest, provided that the landowner was compensated for his loss. This is exactly what the Land Court did in the *Riverbank* case. The court found that it would be inequitable to continue to enforce the restrictions, but the court

also specifically found that the operation of the restrictions was *not* injurious to the public interest. 228 Mass. at 247 (1917).

Given these findings, in particular the last one, the Supreme Judicial Court ruled that the Land Court had unconstitutionally applied the statute in question. "The effect of the instant statute as applied to these facts is to extinguish this right as affecting the land described in the petition so far as found to exist in the respondents, not for any public use nor to subserve any public end, but merely for the benefit of other private landowners whose estates are less valuable by reason of the existence of the right and who could make more advantageous and profitable uses of their own land if these incumbrances were out of the way. It has been found expressly that the enforcement of the restrictions would 'not be injurious to the public interests.' That finding must be accepted as final and true. . . . '[I]t is beyond the legislative power to take, against his will, the property of one and give it to another for what the court deems private uses, even though full compensation for the taking be required.' " 228 Mass. 247 (1917).

The heart of the *Riverbank* case holding, and the basis for its decision on constitutional grounds, was the Land Court's finding that the restrictions in question were not operating in a manner detrimental to the public interest. In the instant case, we have a specific finding below, adequately supported by the evidence, that if these restrictions were enforced, they would operate contrary to the public interest. Some language from the *Riverbank* case is appropriate here: "That finding must be accepted as final and true." 228 Mass. at 247 (1917).

In summary, we emphasize that the rights of the respondents here are to be recognized in full and fair money damages; that the rights they assert relate, not directly to ownership or use of their own land, but to the control of land use in the surrounding community; that, in the century since the deeds were executed, a sophisticated system of statutes and ordinances has arisen for the regulation of land

use in the community; and that it is not in the public interest to enforce the restrictions.

From what we have said it follows that our holding, that the statute is constitutionally applied here, necessarily depends in part on the judge's finding, fully supported in the evidence, that the public interest would not be served by the enforcement of the restrictions. Our holding also depends on the statutory provision that, as we have ordered later in this opinion, compensatory damages are to be awarded where specific performance is denied as to a restriction which is of actual and substantial benefit to the person claiming rights of enforcement.

## CELLAR.

The respondents have stipulated that they do not seek to enforce the restriction on the depth of a lower floor or cellar and do not appeal the decision of the Superior Court in this regard only. Accordingly, that aspect of the final decree declaring this restriction obsolete and unenforceable may be affirmed without further discussion.

## SETBACK OF BUILDING.

Before the trial court, and in their brief and argument before this court, the respondents made no reference to the restriction requiring a specified setback from the front of the lot and barring all but the "usual projection" in this area.[3] Presumably the respondents are content to rely, so far as setback is concerned, on the public bodies mentioned in fn. 4, *infra,* and the zoning provisions and variance procedures. Boston Zoning Code (1963) arts. 7 and 21.

---

[3] The respondents' brief states: "In the course of the trial below, in the interests of brevity, . . . [the respondents] confined their defense of the restrictions to three of the restrictions, *i.e.,* those prohibiting: (i) blocking of the public 'alley'; (ii) 'mercantile' uses; and (iii) 'public stables.' "

Accordingly, that aspect of the decree, declaring this restriction obsolete and unenforceable, may also be affirmed without further discussion.

## Stables.

The restriction against stables is not really at issue between the parties. Whatever their common objectionable traits a garage is not a stable, as we have previously held. The case of *Riverbank Improvement Co.* v. *Bancroft,* 209 Mass. 217 (1911), made it clear that the term stable, as used in such restrictions, implies the presence of domestic animals. It is nevertheless true that the passage of time and the replacement of horse drawn vehicles by the automobile have rendered this restriction both obsolete and of no actual and substantial benefit to the respondents. Moreover, the advent of such public land use controls as G. L. c. 111, § 155, materially reduces the need for its enforcement as it eliminates any remaining threat of a stable's being built in a largely residential area. See *Worcester Bd. of Health* v. *Tupper,* 210 Mass. 378, 381 (1912). Despite the respondents' arguments to the contrary the permissibility of the proposed garage, since it is not a stable, is not before us. Any issues as to the garage would be decided on a proper application of the pertinent provisions of the zoning ordinance.

## Mercantile Uses.

As to the restriction against mercantile uses, we conclude that the proposed hotel would not violate the restriction against use for "mechanical, mercantile or manufacturing purposes." The judge's finding to the contrary was plainly wrong. In a case analyzing the identical phrases in another deed we held that mercantile use was limited to buying and selling commercial commodities for a profit, and did not include the operation of a private hospital. *Carr* v. *Riley,*

198 Mass. 70 (1908). As the hotel and apartment use is permissible, the incidental use of a small portion of the building for shops would not in any case be deemed to create a violation of the restriction. We need not consider the petitioners' further argument that the major changes that have occurred in the neighborhood largely destroy the utility of the restriction against mercantile uses.

## THE PASSAGEWAY.

The final restriction is that mandating that the passageway behind the petitioners' lot, now Public Alley No. 437, shall "be kept open." The judge found, on evidence which clearly supports his findings, that the respondents have an actual and substantial benefit in the enforcement of this restriction and that the proposed building would violate it. However, his further findings that the restriction is obsolete and that the respondents are entitled to only nominal damages are plainly wrong. We nevertheless hold that, even though it is not obsolete, the restriction shall not be specifically enforced. We base our conclusion on other grounds which appear in G. L. c. 184, § 30. These grounds are discussed in detail later in this opinion. In lieu of specific enforcement, damages are to be awarded.

Considerable and conflicting evidence was adduced at trial as to the potential effect that bridging the alley would have on the light and air available to the apartments in the rear of the respondents' building. It appears that all parties are in agreement that the "bridge" would decrease the direct sunlight available to the apartments; the dispute is as to the magnitude of the decrease. The testimony on ambient light and on available air was conflicting as to whether there would be an increase or a decrease. Clearly there would be some effect on the property. There was testimony to support a finding that the effect would not be de minimis but would be substantial.

The petitioners argue that any effect on light and air is nevertheless not a violation as the restriction was only

designed to preserve these amenities in a neighborhood "wholly occupied by dwellings of a high class, to which air and light and prospect are not only desirable, but essential. ..." *Attorney Gen.* v. *Williams,* 140 Mass. 329, 334 (1885). We need not consider the effect of any change in the class of dwellings in the neighborhood. The *Williams* case is authority that the restriction in question was designed to preserve light and air to the properties it benefited. Any decrease in available light and air is a violation of that restriction and a detriment to the properties it benefits regardless of the class to which they may be descriptively consigned.

Nor do we believe that such changes as have occurred in the neighborhood make this restriction obsolete. While restrictions requiring setbacks or prohibiting mercantile uses clearly have reference to maintaining the overall character of a neighborhood and can thus become obsolete as that neighborhood changes, cf. *Jackson* v. *Stevenson,* 156 Mass. 496, 502 (1892), this restriction is intended to secure a specific benefit to each residence it affects. So long as any of those residences continues to exist it cannot be called obsolete. As this urban area has grown and become ever more congested in the century since this restriction was first imposed, light and air have become more, not less, valuable. The restriction securing the respondents' rights to them is certainly not obsolete.

Nevertheless, we find no error in the judge's conclusion that this restriction should not be specifically enforced. We recognize that in the past this court has upheld mandatory injunctions calling for the destruction and removal of substantial permanent structures built in violation of such a restriction. *Codman* v. *Bradley,* 201 Mass. 361 (1909). *Stewart* v. *Finkelstone,* 206 Mass. 28 (1910). *Gilbert* v. *Repertory, Inc.* 302 Mass. 105 (1939). We have done so over the strong objection that "it would operate oppressively and inequitably, and impose on the defendant a loss disproportionate to the good it can accomplish . . .." *Stewart* v. *Finkelstone,* 206 Mass. 28, 38 (1910). But G. L. c. 184, § 30, was designed to change the law in this field and

make certain equitable considerations between the parties, as well as a consideration of the public interest, grounds to relegate the beneficiary of such a restriction to money damages.

There are several alternatives in c. 184, § 30, which support the judge's decision to deny specific enforcement. On the evidence in this case, the petitioners have made a compelling case for such denial based on all of the following statutory grounds: "(1) changes in the character of the properties affected or their neighborhood . . . [and] in applicable public controls of land use or construction, or in any other conditions or circumstances, [which] reduce materially the need for the restriction or the likelihood of the restriction accomplishing its original purposes . . . or (4) continuation of the restriction on the parcel against which enforcement is claimed . . . would impede reasonable use of land for purposes for which it is most suitable, and would tend to impair the growth of the neighborhood or municipality in a manner inconsistent with the public interest . . . or (5) enforcement, except by award of money damages, is for any other reason inequitable or not in the public interest."

Applying these criteria, we observe that the evidence shows, inter alia, that the properties and the neighborhood have drastically changed. Single-family residences have been replaced by moderately high-rise buildings for apartments and institutional use. We have found that the passageway restriction is of an actual and substantial benefit in its effect on light and air, but the proposed bridge will have only a modest impact in view of the drastic changes which have already occurred. In particular, an occupant of the respondents' building, in looking out a rear window of that structure, would see to his immediate left and across the passageway the high-rise Ritz-Carlton building. As to the petitioners' unused land to that viewer's immediate left, on the same side of the passageway, it seems inevitable that, even if the bridge were not permitted, a building higher than the respondents' building would at some time be constructed on it.

Further, since this restriction was first imposed, public controls have been imposed which tend to preëmpt the restriction in a manner contemplated by § 30. At least three different public authorities have been given control over the basic design structure of buildings on premises subject to the restrictions.[4] Also, a public commission of the city[5] has been given authority, with the approval of the mayor, to permit bridging over public alleys. Additionally, at least three zoning variances will have to be procured before the entire structure can be completed.

The record also clearly supports a conclusion that continued enforcement of the restriction would tend to impede reasonable use of the land for purposes for which it is most suitable. The uncontradicted evidence was that a free standing tower is economically unfeasible presumably because of the small size of the parcel, and that the plaintiffs' proposal for an apartment-hotel complex connected to the adjacent Ritz-Carlton is the most suitable use of the land.

The evidence supports a conclusion that the proposed bridge is not an arbitrary and unnecessarily large intrusion. The twelve stories of the bridge relate to twelve of the lower floors of the new building which are to be used as a hotel; above those floors there will be apartments. The hotel floors are feasible only if connected to the hotel services of the Ritz Carlton. Therefore, all considerations of equity, and the most suitable use of the property, support the planned bridge construction in size as well as purpose.

Weighing and comparing the interests of the parties and the public in accordance with the several provisions of § 30 bring us almost inevitably to the conclusion that there should be no specific enforcement. In the words of provision (5) of the statute, which unquestionably confers the broadest discretion on the court, enforcement here would be

---

[4] These three public authorities are the Boston redevelopment authority design review board, the Back Bay architectural commission, and the parks commissioner.

[5] The public improvement commission of the city of Boston.

inequitable and not in the public interest. The magnitude of the harm to the petitioners in specific enforcement of the restriction far exceeds that to the respondents in its denial. Moreover we are mandated by the statute to have due regard for the public interest in determining the manner of enforcement of a restriction. The land in question has been vacant for over a decade. We take judicial notice of the exceedingly high property tax rates current in the city of Boston and the beneficial effect on the tax base of the petitioners' plan to construct a multimillion dollar project of public usefulness on presently unutilized land. In the circumstances both the balance of equities between the parties and a consideration of the public interest require that the respondents accept money damages by way of enforcement of this restriction.

We consider it appropriate to comment on one statement in the dissenting opinion, viz., the statement of the two dissenting Justices that they "cannot be unmindful of the precedential effect which the court's decision of this case will have on a large part of the Back Bay of Boston, far beyond the several parcels of land owned by these particular litigants." We comment here that the statute, G. L. c. 184, § 30, as well as the reasoning of our opinion in this case makes it clear that each case is to be decided according to its own circumstances. The determination by the Superior Court in this case of the public interest and the equities between the parties will not be determinative of the rights of other parties to other petitions, concerning other parcels of real property, and this will be so even if the terms of the restrictive covenants are the same. Nor, in the consideration of the future welfare of the Back Bay area, should we overlook the comprehensive controls exerted by public laws concerning land use.

CONCLUSION.

The final decree is reversed and the case is remanded to the Superior Court, where damages are to be assessed for

the loss of benefit in light and air. Such further evidence as the judge deems to be necessary shall be heard on the issue of damages. We observe that, since the obstruction in the passageway is contemplated but not yet in existence, actual assessment or payment of damages may be considered by the judge to be premature. By interlocutory decree the judge shall order that, in so far as the restrictions discussed herein are concerned, the proposed construction may commence forthwith, before the issue of damages is resolved, with such provision for security for the respondents as the judge in his discretion deems appropriate. A new final decree shall ultimately be entered which awards damages and which is otherwise consistent with this opinion.

*So ordered.*

QUIRICO, J. (dissenting, with whom Reardon, J., joins). I am unable to agree with the decision of the court. I disagree principally with the decision that G. L. c. 184, § 30, inserted by St. 1961, c. 448, § 1, is constitutional as applied in this case and that in this proceeding, which is brought under the terms of such statute, the respondents may be deprived of valuable property rights and be required or permitted to accept money damages in lieu thereof. I also disagree with certain factual conclusions reached by the court in its opinion.

### THE COMMONWEALTH RESTRICTIONS.

It will be helpful to preface my discussion by a brief restatement of certain facts involved in this case and a summary of the conclusions ultimately reached by the trial judge and this court.

The petitioners as trustees own two parcels of land in Boston which together occupy the entire frontage of the block on Arlington Street between Newbury Street and Commonwealth Avenue, opposite the Boston Public Garden. The beneficial owner of both parcels appears to be

Cabot, Cabot & Forbes or an affiliate thereof. A portion of
each of the two parcels is subject to a passageway desig-
nated as "Public Alley No. 437" (the passageway) which
runs from Arlington Street to Berkeley Street, parallel to
Newbury Street and Commonwealth Avenue. The dividing
line between the petitioners' two parcels is at the center line
of the passageway. Both of the petitioners' parcels are
subject to certain of the Commonwealth Restrictions, as is
the respondents' property.

The new structure the petitioners propose to erect and
operate for hotel and apartment purposes in combination
with their Ritz-Carlton Hotel would rise to a height of
twenty-eight stories on their now vacant parcel and would
cover in part the passageway. The structure over the
passageway would connect the new building to the present
hotel at each of the second through the thirteenth floors.
The rear wall of the connecting structure would be of solid
masonry located even with the rear wall of the present
hotel, and would start thirteen feet above the roadway of
the alley and rise to a height of 137 feet. It would have the
effect of converting the alley into a tunnel thirteen feet high
from a point sixty-five feet west of Arlington Street to the
rear wall of the hotel, which is about 134 feet west of the
street. The light and air otherwise available to the respond-
ents' property from the direction of Arlington Street will be
diminished by the proposed construction over the alley.

The trial judge concluded that the building proposed by
the petitioners would violate the Commonwealth Restric-
tions with respect to (a) the construction above the pas-
sageway, (b) the mercantile operations in the new building,
(c) encroachment by construction beyond the set-back line
on Commonwealth Avenue, (d) the construction of an
underground garage, and (e) the construction below the
prescribed bottom level of buildings. The trial judge found
that the respondents had an actual and substantial benefit
in all of the restrictions but held that they were all obsolete
and that therefore the respondents were not entitled to
either specific enforcement or money damages. This court
holds that there was no error in the judge's decision that

none of the restrictions shall be specifically enforced, although for reasons different from those on which he relied. The court holds that the only restriction which continues to be at issue between the parties is that relating to the passageway. As to this restriction it holds that it is of actual and substantial benefit to the respondents but that the respondents are to receive money damages in lieu of specific enforcement.

I disagree with the court's treatment of the restrictions relating to the passageway and to the set-back requirement along Commonwealth Avenue. For the reasons discussed below, I would hold that the respondents have an actual and substantial benefit in these two restrictions, that the restrictions have not become obsolete, and that they should be specifically enforced.

1. *Set-Back Restriction.* The portion of the petitioners' vacant lot which is identified as No. 2 Commonwealth Avenue is subject to the restriction that any building thereon shall be set back twenty-two feet from the street. The remainder of their vacant lot (the portions identified as Nos. 4, 6, 8 and 10 Commonwealth Avenue) and each of the other lots in that block of Comonwealth Avenue are subject to a similar set-back restriction although limited to twenty feet. Both restrictions expressly permit steps, windows, porticos and other usual projections in the set-back area.

As to No. 2 Commonwealth Avenue the petitioners' proposed new building would be set back from the street a distance of twenty feet, thus violating the restriction by two feet. In addition, the petitioners propose to encroach an additional five feet upon the set-back area along the entire Commonwealth Avenue frontage of the building with a structure described as an "arcade," which appears to be in reality a projection of the new building's first three stories into the reserved area. It seems clear that the arcade is not one of the "usual" permitted projections qualifying as an exception to the set-back restrictions and it would violate both of them.

The court states that as the respondents made no

reference to the set-back restriction[1] either before the trial judge or this court, that aspect of the final decree "declaring this restriction obsolete and unenforceable, may . . . be affirmed without further discussion." I do not agree.

In petitioning the court under G. L. c. 240, § 10A, for a declaration that the Commonwealth Restrictions at issue here are obsolete and unenforceable, it seems clear that the burden of proof rests on the petitioners. Nothing in that section or in c. 184, § 30, suggests that this general rule governing the burden of proof does not apply in this type of proceeding. Moreover, the case is before us on appeal from all aspects of the final decree entered below except as it related to the restriction on cellar depth, and the evidence is reported. Therefore all questions of law, fact and discretion are open for our review, and we may make findings contrary to those of the trial judge if we find the latter to be plainly wrong. *Gordon* v. *O'Brien*, 320 Mass. 739, 740 (1947). *Loyal Protective Life Ins. Co.* v. *Massachusetts Indem. & Life Ins. Co.* 362 Mass. 484, 485 (1972). In light of these considerations, I conclude that whether or not the respondents failed to argue the benefit of the set-back restriction, the record and the evidence require a finding that the petitioners have not sustained their burden of proof that this restriction is now obsolete and should not be specifically enforced. Accordingly, I would hold that the judge's finding to the contrary was plainly wrong.

It appears that, as originally conceived, the set-back restriction was primarily intended to insure the continued existence and enjoyment of unobstructed open spaces between the Commonwealth Avenue street lines and the fronts of buildings along the street. *Attorney Gen.* v. *Algonquin Club*, 153 Mass. 447, 450-451 (1891). In *Attorney Gen.* v. *Gardiner*, 117 Mass. 492, 493 (1875), there is a

---

[1] In its discussion the court refers to only one "restriction requiring a specified setback . . .," although there are, as explained, two set-back restrictions involved in this case. As my disagreement with the court's treatment of the set-back requirement does not turn on the two-foot difference between the two restrictions, I will refer hereafter to "the set-back restriction" in my discussion.

report by a single justice to the full court describing the history of the development of a plan for the Back Bay by a legislative committee in the following terms: "One of the contemplated streets laid out on that plan was called Commonwealth Avenue, beginning at the street west of the Public Garden, called Arlington Street, and extending westwardly a mile and a half towards Brookline, two hundred feet in width, with ornamental spaces in the middle thereof one hundred and twelve feet wide, and with spaces twenty feet in width left open for turf and shrubbery upon the front of the lots. And the committee devised, as part of said scheme, that all houses built upon this avenue should be set back twenty feet from the front lines of the lots, and that spaces twenty feet in width should be left open for turf and shrubbery in front of the houses."[2]

Commonwealth Avenue as envisioned and planned by the original committee became a reality and to this day, more than a century later, continues to be a broad boulevard 200 feet wide, with an ornamental space in the middle thereof, and with spaces twenty feet in width left open for turf and shrubbery upon the front of the lots. As the court in its opinion concludes with respect to the passageway restriction, I believe that the growing urban congestion due to the increasing numbers of buildings and inhabitants make such open spaces more, not less, valuable than when the set-back restriction was first imposed. There is nothing in the record to indicate that this open space of twenty feet has been violated on any lot located in the block of Commonwealth Avenue involved in this case. But by affirming a finding that the restriction requiring the set-back is obsolete and unenforceable as to property at the very gateway of Commonwealth Avenue, the court is in effect declaring it to be obsolete and unenforceable all along the avenue. The rights of other parties in future cases may be unnecessarily prejudiced thereby.

---

[2] The full court held in the *Gardiner* case that it was a violation of the set-back restriction to build underground coal bins which projected three feet above the existing level of the street, within the set-back limit, and ordered the structure removed.

2. *The Passageway.* · Both the petitioners' Ritz-Carlton Hotel property and their vacant lot are subject to the further restriction that the passageway shall "be kept open." The petitioners propose a structure which will permanently block a substantial portion of the passageway above the first story of their buildings near Arlington Street.

As early as 1885 this court stated with respect to this restriction: "[W]e think the language of the stipulation was designed to signify a separation of sixteen feet at least between the rear portions of the buildings abutting on the passageway. A passageway sixteen feet wide was not merely to be kept open at the ends, but open to the sky throughout its entire length, for the general convenience and benefit. It is easy to see that the rights of others would be lessened, upon any other construction." *Attorney Gen.* v. *Williams*, 140 Mass. 329, 334 (1885). I agree with today's holding by the court that the restriction with respect to the passageway "was designed to preserve light and air to the properties it benefited," and that "[a]s this urban area has grown and become ever more congested in the century since this restriction was first imposed, light and air have become more, not less, valuable. The restriction securing the respondents' rights to them is certainly not obsolete."

The question then becomes what remedy or relief is available to the parties. This court holds that notwithstanding its findings that the passageway restriction is of actual and substantial benefit to the respondents and that it has not become obsolete, the petitioners have the right, under the terms of G. L. c. 184, § 30, to compel the respondents to receive money damages in lieu of their right to specific enforcement of the restriction.[3] This statute purports to permit this result. The court holds that the statute is constitutional. I disagree with that holding.

[3] In relegating the respondents to money damages the court relies entirely on this statute. Thus we are not concerned with cases such as *Jackson* v. *Stevenson*, 156 Mass. 496, 500-503 (1892), where on general principles of equity, apart from any statute, specific enforcement of an equitable deed restriction was denied and relief limited to money damages.

## CONSTITUTIONALITY OF G. L. c. 184, § 30.

General Laws c. 184, § 30, provides that no restriction shall be enforced or declared to be enforceable "unless it is determined . . . [to be] of actual and substantial benefit to a person claiming rights of enforcement." It further provides that even if determined to be of such benefit, a restriction shall not "be enforced or declared to be enforceable, except in appropriate cases by award of money damages," if any one of five specified sets of facts or circumstances exists. These five grounds for denial of specific enforcement are set out in full in fn. 2 of the court's opinion.

While acknowledging that the Commonwealth Restrictions are property interests, the court holds that the operation of c. 184, § 30, on the facts of this case does not amount to a taking of private property "in the constitutional sense." It states that the statute should be viewed not as "effecting a taking but as altering the remedies by which such restrictions may be enforced, in certain circumstances." It also states that even if § 30 were "viewed as allowing a taking of property in this case, we believe the taking would be constitutional."

I cannot agree with the court's analysis of the statute at issue here. It is clear to me that what the petitioners propose to do under the terms of § 30 — and what the court by its opinion permits them to do — constitutes a taking of the respondents' property rights. *Riverbank Improvement Co.* v. *Chadwick*, 228 Mass. 242, 246-249 (1917). *Jenney* v. *Hynes*, 282 Mass. 182, 191-192 (1933). See *Ladd* v. *Boston*, 151 Mass. 585, 588 (1890). And it seems equally clear that this taking and the statute which governs it violate the Fifth and Fourteenth Amendments to the United States Constitution and art. 10 of the Massachusetts Declaration of Rights which provides in part: "Each individual of the society has a right to be protected by it in the enjoyment of his life, liberty and property, according to standing laws. . . . [B]ut no part of the property of any individual can. with justice, be taken from him, or applied to public uses, without his own consent, or that of the representative body

of the people. . . . And whenever the public exigencies require, that the property of any individual should be appropriated to public uses, he shall receive a reasonable compensation therefor."

This language recognizes that private property may be taken pursuant to the sovereign power of eminent domain coupled with the obligation to pay reasonable compensation, but that such power is always subject to the limitation that it may be exercised only when "the public exigencies require" private property to be applied to "public uses." Absent that public exigency, or public purpose, an attempted taking of private property by the Commonwealth for a private purpose would be in excess of its sovereign powers and would amount to an expropriation, regardless of any provision for payment of damages. It would be no less an expropriation if the same taking were attempted by a private individual to whom a statute purports to give the power to do so.

Admittedly the Legislature may, and on many occasions has, delegated to private corporations the power to exercise rights of eminent domain to acquire easements or other interests in land, and such delegation has been upheld by this court in numerous decisions. See *Opinion of the Justices*, 330 Mass. 713, 718-719 (1953),and cases cited therein. Although the delegation is often accomplished by special statutes[4] it is also often accomplished by various provisions of the General Laws.[5] The public purpose for which the power is delegated by each of these statutes is clear and unmistakable.

The statute at issue here is very different. In upholding the constitutionality of G. L. c. 184, § 30, in this case I

---

[4] See the collection of such statutes in *Opinion of the Justices,* 330 Mass. 718, fn. 1 (1953).

[5] See e.g., G. L. c. 160, § 80, relating to railroads; G. L. c. 161, § 58, relating to street railways; G. L. c. 164, § 72, relating to electric companies; G. L. c. 164, § 75C, relating to natural gas pipe line companies. See also the following statutes delegating this power to governmental subdivisions: G. L. c. 40, § 14, to cities and towns; G. L. c. 121, § 26P, to housing authorities; G. L. c. 121, § 26RR, to redevelopment authorities; St. 1952, c. 354, § 5, to the Massachusetts Turnpike Authority.

believe the court has placed in the hands of private persons, in this instance the petitioners, the power to take from their neighbors an interest in real estate without the latter's consent, not for any public use or purpose but solely for the petitioners' own private gain and profit. I am reminded of the views of the dissenting Justices in *Moskow* v. *Boston Redevelopment Authy.* 349 Mass. 553, 572-575 (1965), concerning the character of the taking involved in that case; it seems that the fears they expressed therein have been realized.[6] The fact that compensation is given does not make it any less a taking. It is precisely the type of taking which the court has repeatedly held to be constitutionally impermissible. This constitutional limitation is too well understood and established and has too often been stated and applied to require lengthy general discussion.[7]

We have not had any occasion in the past to consider the applicability of this constitutional limitation to c. 184, § 30; in every case but one which has arisen under this section since its enactment in 1961, it has been found that specific enforcement of the deed restrictions involved was still warranted. *Walker* v. *Sanderson,* 348 Mass. 409 (1965). *Canty* v. *Donovan,* 361 Mass. 879 (1972). *Harrod* v. *Rigelhaupt,* Mass. App. Ct.        (1973).[a] Cf. *Walker* v. *Gross,* 362 Mass. 703 (1972) (no violation of the restriction found). However, I do not believe it is entirely a question of

---

[6] "... [The taking by the Boston Redevelopment Authority] is the taking ... of land with building of private persons so that other private persons may construct, for their own use and benefit, a different building on the land taken. ... Transcending the effect of the holding of the majority in the present case are its implications for the future. ... [I]t is not difficult to conceive of situations wherein economically powerful private interests, shielded by the opinion of the majority and working behind the facade of a public authority which has the power of eminent domain, will be enabled to become the real beneficiaries of the exercise of that power in contravention of Article X of the Declaration of Rights of the Constitution of the Commonwealth." 349 Mass. at 573, 574-575 (1965). It is worth noting that under c. 184, § 30, it is not even necessary to work "behind the facade of a public authority" to accomplish the taking.

[7] Many of our opinions and decisions on this subject are collected and discussed in *Allydonn Realty Corp.* v. *Holyoke Housing Authy.* 304 Mass. 288, 292-297 (1939), and later in *Opinion of the Justices,* 332 Mass. 769, 781-784 (1955).

[a] 298 N. E. 2d 872.

first impression. In *Riverbank Improvement Co.* v. *Chadwick,* 228 Mass. 242 (1917), a statute very similar to c. 184, § 30, was before this court and the same constitutional issue was involved. In that case, Riverbank Improvement Co. petitioned the Land Court to register its land in Boston free and clear of restrictions which prohibited its use for, among others, an apartment house or mercantile purposes. The petition was filed under St. 1915, c. 112, which, as the court states in its opinion, is essentially the same as § 30, permitting the Land Court to deny specific enforcement of a restriction if it found that the enforcement "would be inequitable or injurious to the public interests."

The Land Court found that the restrictions on the *Riverbank* case property were " 'valid and have not become inoperative, illegal or void,'. . . that there had been no violation of the restrictions within the restricted area," and that the respondent Chadwick might be damaged by the nonenforcement of the restrictions, but it concluded "that it would be 'inequitable' to enforce the restrictions." *Id.* at 245. On appeal this court held that St. 1915, c. 112, was unconstitutional as applied in that case because it violated the language I have quoted earlier from art. 10 of the Declaration of Rights.

It is true that in the *Riverbank* case the Land Court found that the enforcement of the restrictions at issue would " 'not be injurious to the public interests' " (*id.* at 247) whereas the trial judge in this case found that "it would be oppressive, inequitable and not in the public interest to give effect to the Commonwealth Restrictions in this factual setting." Nevertheless, I think that much of the court's discussion concerning the constitutionality of St. 1915, c. 112, in the *Riverbank* case is applicable here. The court stated: "The effect of the instant statute as applied to these facts is to extinguish this right as affecting the land described in the petition so far as found to exist in the respondents not for any public use nor to subserve any public end, but merely for the benefit of other private landowners whose estates are less valuable by reason of the

existence of the right and who could make more advan-
tageous and profitable uses of their own land if these
incumbrances were out of the way. . . . '[I]f the statute is
merely for the benefit of individual property owners, the
purpose does not justify the taking of a right in land against
the will of the owner.' That principle is precisely applicable
to the statute at bar. If the use for which the property is
taken is not public, it is of no consequence that ample
provision is made for compensation to the owner. It may be
that it would be wiser for the respondents to receive money
damages and submit to the extinguishment of their other
property right. But that fact, if it be a fact, is wholly
irrelevant. . . . In the continued enjoyment of . . . [the right
under art. 10 of the Declaration of Rights to be protected in
the enjoyment of his property] the individual is not obliged
to submit to the judgment of court or Legislature that he
ought to hand . . . [this property right] over for com-
pensation to some one or more of his fellows in their private
interest. He is secure under the Constitution in his right to
keep what is his own, even though another wants it for
private uses and may be willing to pay more than its value."
228 Mass. 242, at 247-248 (1917).

I believe that the same basic constitutional defect which
this court found in the operation of St. 1915, c. 112, on the
facts in the *Riverbank* case, pervades G. L. c. 184, § 30.
That defect is the total absence of any public use or public
purpose to support giving the petitioners the right to take
away the respondents' property rights embodied in the
restrictions.[8] The court in the case before us relies heavily
on the trial judge's finding that it would not be in the public
interest to enforce the Commonwealth Restrictions both in
upholding the constitutionality of G. L. c. 184, § 30, and in

---

[8] The constitutional doubts cast on § 30 by the *Riverbank* case, *supra*, have
been considered and discussed by the statute's drafters and other commentators.
See Blood, Obsolete and Uncertain Restrictions and Riverside Improvement Co.
vs. Chadwick, 228 Mass. 242, A Constitutional Discussion, 45 Mass. L. Q. (No. 2)
43 (1960); Thirty-sixth Report of the Judicial Council (December, 1960), Pub.
Doc. No. 144, pp. 80-82; 1961 Ann. Surv. of Mass. Law, § 1.2; Note, 44 B. U. L.
Rev. 201, 208-209, 211-212 (1964).

distinguishing the *Riverbank* case. However, I do not
believe the finding disposes of either problem, for our cases
make clear that acts which are in the "public interest" or
constitute a "public benefit" do not without more con-
stitute a "public purpose." It is only when the latter is
found to exist that a taking of private property can be
justified.

Nevertheless, the court appears to equate these terms
throughout its opinion, as is seen particularly in its empha-
sis on the "beneficial effect" that the petitioners' project
will have on Boston's tax base.[9] I think it is clear that the
taking of private property in order to expand the real estate
tax base would not be a taking for a public purpose, even if
accomplished by a public body. In *Opinion of the Justices,*
332 Mass. 769, 783-784 (1955), relating to a plan to develop
the area now occupied by the Prudential Center, this court
said: "[T]he primary design of the bill is to provide for the
acquisition of the area by the use . . . of substantial sums of
public money and . . . to formulate a plan for development,
including the devoting of some portions of the area to truly
public uses, and the return of the remainder to private
ownership to be rented or sold for private profit, with the
expectation that adjacent areas and the city as a whole will
benefit through the increase of taxable property and of
values. But this kind of indirect public benefit has never
been deemed to render a project one for a public purpose.
This aspect of the matter was thoroughly covered in the
leading case of *Lowell* v. *Boston*, 111 Mass. 454, at page 461
[1873],cited and quoted in *Opinion of the Justices*, 211
Mass. 624, 625 [1912]." The language thus referred to

---

[9] The court specifically mentions the tax benefit the general public will derive
from the petitioners' project as a basis for its conclusion that if the petitioners in
this case have effected a taking at all, it was not (unconstitutionally) "accom-
plished for a purely private purpose." And near the end of its opinion the court
states: "Moreover we are mandated by the statute to have due regard for the
*public interest in determining the manner of enforcement of a restriction.* The
land in question has been vacant for over a decade. We take judicial notice of the
exceedingly high property tax rates current in the city of Boston and the beneficial
effect on the tax base of the petitioners' plan to construct a multimillion dollar
project of public usefulness on presently unutilized land."

includes the following: "The promotion of the interests of individuals, either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object. However certain and great the resulting good to the general public, it does not, by reason of its comparative importance, cease to be incidental. The incidental advantage to the public, or to the State, which results from the promotion of private interests, and the prosperity of private enterprises or business, does not justify their aid by the use of public money raised by taxation." 111 Mass. 454, 461 (1873); and 211 Mass. 624, 626 (1912).[10]

It seems clear to me, therefore, that the inclusion of the words "the public interest" does not cure the constitutional defect I perceive to exist in G. L. c. 184, § 30. Nor do any of the considerations set forth as factors in the other four provisions of the section change the basic character of the petitioners' taking from one for their own private benefit and profit to one for a public purpose. It is my opinion that even if there were findings of all the facts necessary to satisfy any or all of the five provisions of § 30, the section as applied in this case would still purport to authorize an unconstitutional taking of private property.

In reaching this conclusion, I am not, as the court implies, exalting "the discretionary remedy" of specific performance "into a constitutional right," and thereby limiting or removing the traditional and inherent discretion of the equity court. I, of course, recognize that specific enforcement is not a remedy that is "invariably and automatically" granted and, in particular, I do not mean to suggest that the Commonwealth Restrictions must be enforced in perpetuity against all lots in the Back Bay area to which they were made applicable more than a

---

[10] Although that language was used in relation to the purposes for which the power of taxation may be exercised, it applies equally to the power of eminent domain. *Lowell* v. *Boston, supra*, at 462.

century ago. Even before the passage of G. L. c. 184, § 30, and G. L. c. 240, §§ 10A-10C, equitable restrictions found to be of no continuing value because of changed conditions would not be specifically enforced. See, e.g., *Jackson* v. *Stevenson*, 156 Mass. 496, 500-503 (1892). But c. 184, § 30, presents a very different situation. The statute explicitly prohibits the granting of specific enforcement even as to a restriction which is of actual and substantial value to a person claiming its benefit when any one of a broad range of factors is found to exist. It is the statute itself which is setting new limits on the sound discretion of the trial judge as well as effecting a radical — and to my mind, unconstitutional — change in the substantive law of property.

In my opinion there always has been, and there continues to be, a constitutionally permissible way to eliminate restrictions which continue to benefit those entitled to enforce them. There is no constitutional obstacle to the elimination of any or all of the restrictions by the proper exercise of the power of eminent domain. By the words "proper exercise" I mean the exercise of that power for a public use or public purpose. Restrictions and easements are no more beyond the reach of the sovereign power of eminent domain than are fee interests in real estate.[11]

### APPLICATION OF G. L. c. 184, § 30 IN THIS CASE.

Even on the assumption, as the court holds, that G. L. c. 184, § 30, is constitutional, I do not agree with the ultimate conclusion that under § 30 the respondents' relief should be limited to money damages rather than specific

---

[11] The court apparently considers eminent domain a hollow remedy and perhaps useless vehicle "to alter land use decisions inscribed in a deed over a century ago by parties to a private land transaction." Whether or not this is true, I would point out that the Commonwealth Restrictions at issue here were established by the Legislature itself to govern all of the Back Bay, and the Commonwealth retained and still possesses the power to enforce most of them for the public interest. They certainly do not represent land use decisions established and imposed on the Back Bay by merely private parties.

enforcement of the restriction relating to the open passage-way.[12]

1. The court relies in part on its conclusion that "the properties and the neighborhood have drastically changed [since the restrictions were imposed]. Single-family residences have been replaced by moderately high-rise buildings for apartments and institutional use." See c. 184, § 30, provision (1). I do not consider this change to be drastic. It seems clear to me from the record that Commonwealth Avenue in the block between Arlington and Berkeley streets, with its unique architectural and physical features, is one of the few remaining residential boulevards in the city, providing a welcome oasis amidst the skyward push of Boston's newer commercial buildings. Contrary to the court's conclusion, I believe that the erection of a twelve-story bridging structure at the very entrance of this block does constitute "an arbitrary and unnecessarily large intrusion" which is not justified by any change in the character of the area.

2. The court also relies on the existence of a variety of public controls over the use which may be made of the petitioners' two parcels and of Public Alley No. 437. See fns. 4 and 5 to the court's opinion. The existence of these "public controls of land use or construction" does not constitute a basis for limiting relief for violation of the restrictions to money damages rather than specific enforcement unless it is found that they "reduce materially the need for the restriction or the likelihood of the restriction accomplishing its original purposes or render it obsolete or inequitable to enforce except by award of money damages." § 30, provision (1). I do not believe the record in this case will support such a finding, particularly with reference to the restriction that the passageway shall "be kept open." There is no showing that any public control will ever insure

---

[12] Reference is made to this restriction alone because it is the only one which the court has found to be of "actual and substantial benefit" to the respondents. As I have indicated, I would also find that the respondents continue to derive such benefit from the set-back restriction and are likewise entitled to have it specifically enforced.

to the respondents the full benefits to which they are entitled under that restriction.

The existence of public controls, in whatever form, is no substitute for the respondents' rights under the Commonwealth Restrictions. The restrictions are property rights not ordinarily subject to the changing views of legislative bodies or the discretionary decisions of administrative officers. The respondents have a right to enforce the restrictions by their own action. Moreover, the record in this case demonstrates that the public controls applicable to the petitioners' premises have been changed from time to time with a frequency and in a manner which makes them of value to those premises but often to the detriment of the respondents' premises. These changes will be identified below.

3. The court concludes its discussion of reasons for its decision with the following statement: "In the circumstances both the balance of equities between the parties and a consideration of the public interest require that the respondents accept money damages by way of enforcement of this restriction [relating to the public alley]." I have already quoted from several decisions of this court pointing out the important differences between "public interest" and "public use" or "public purpose." I now reach the question whether "the balance of equities between the parties" requires that the respondents accept money damages rather than specific enforcement, or whether, in the language of provision (5) of § 30, "enforcement, except by award of money damages, is for any other reason inequitable." I would answer both questions in the negative.

(a) The equitable enforcement of restrictions such as the Commonwealth Restrictions is granted in part for the reason that a person purchasing land with notice that it is subject to such restrictions not only acquires their benefits but assumes their burdens as well. *Linzee* v. *Mixer,* 101 Mass. 512, 529-530 (1869). *Bailey* v. *Agawam Natl. Bank,* 190 Mass. 20, 23 (1906). *Riverbank Improvement Co.* v. *Chadwick,* 228 Mass. 242, 246 (1917). In the present case

the restrictions were duly recorded. As this court has stated in several similar cases, "[T]he great increment in the value of the land of the defendant which will arise from refusal to enforce this restriction is of slight if any consequence. The restriction was matter of record in the chain of the defendant's title and the defendant was bound by notice thereof." *Allen* v. *Massachusetts Bonding & Ins. Co.* 248 Mass. 378, 387 (1924). *Jenney* v. *Hynes*, 282 Mass. 182, 193 (1933). This observation is applicable to the situation in which the petitioners find themselves. They are not shown by the record to have been anything other than experienced willing buyers with notice of limitations on the land they were purchasing; the limitations would ordinarily be a factor influencing informed buyers and sellers of land in fixing its purchase price.

(b) There is nothing in the record before us to indicate that the respondents have violated the Commonwealth Restrictions in any manner, or, as mentioned, that such violations exist anywhere on the same block.

(c) The vacant lot now owned by the petitioners appears to have had the benefit of so much special and preferential treatment from public authorities, both before and after its purchase by the petitioners, that it is not possible for me to agree with any claim that it is entitled to still more benefits by the further balancing of equities in its favor to the detriment of the respondents. This special and preferential treatment is indicated by the following matters of public record.

i. *St. 1954, c. 418.*   Section 1 of this statute declared that the vacant lot now owned by the petitioners had become decadent through "unoccupancy of certain of the buildings thereon" to an extent detrimental to the area, that its rehabilitation was thwarted by existing limitation on the height of buildings which could be built thereon, that a building on the adjacent lot (the Ritz-Carlton Hotel) was 155 feet high, and that the construction of a building to that height would enable the lot to be put to its most beneficial use without detriment to the public good. Section 2 then authorized the erection of a building on the lot to

a height of 155 feet. The statute was signed with an emergency preamble.

This statute evolved from House Nos. 1816 and 1817, both of which were caused to be filed by Irving Saunders who then owned the vacant lot now owned by the plaintiffs.

ii. *St. 1961, c. 179.* This statute authorized designated officers of the city of Boston to issue "a permit to construct a structure or structures bridging a portion or portions of public alleys and public ways in said city at a place where said person or persons own the land with the buildings thereon on opposite sides of such public alley or public way, for the purpose of connecting said buildings." This statute evolved from House No. 1507.

iii. *St. 1961, c. 323.* By § 1 of this statute the Commonwealth released the lands in the Back Bay district of Boston from the restriction concerning the level of cellar floors of buildings erected thereon. Section 2 of the statute released the specific portion of Public Alley No. 437 running between the petitioners' two parcels from the Commonwealth Restriction requiring that the passageway "be kept open." The rights were released "to the extent necessary to permit a structure not over fifteen feet high or wide." These sections were passed pursuant to House Nos. 892 and 894, respectively. The releases in both sections of this statute were made "subject to the rights, if any there be, of parties other than the commonwealth."

iv. *Ordinances of Boston (1965) c. 8, § 1.* In 1965, the building height limitation for the petitioners' present vacant lot and for the lot on the opposite corner of Arlington Street and Commonwealth Avenue was increased to 285 feet "for a distance of one hundred feet running westerly along Commonwealth avenue from . . . Arlington Street." The same ordinance amendment fixed the height limitation for buildings at certain corners of the intersection of Commonwealth Avenue with Berkeley, Clarendon and Dartmouth streets at 200 feet.

v. *1971 Amendment of Building Height Limit.* The instant case was tried in March, 1971. At the trial the parties proceeded on the assumption that the petitioners'

vacant lot was subject to a building height limitation of 285 feet. The respondents now state in their brief that "it should be noted that by amendment proposed by the Boston Redevelopment Authority and adopted by the Zoning Commission and approved by the Mayor, effective February 17, 1971 . . . the Boston zoning ordinance was amended to carve out of the entire Back Bay (otherwise an H-5-70 [*i.e.*, imposing a 70-foot maximum height limitation] district) one small district, consisting solely of petitioners' land and known as H-5 District, subject to no (zoning ordinance) limitation of height at all." The respondents suggest there may be some question of the validity of this action, but we are not required to pass thereon.

This summary of successive acts by various government agencies and officials spans a period of twenty years. It started with St. 1954, c. 418, declaring the petitioners' now vacant lot decadent and increasing the applicable building height limitation to 155 feet, coupled with an emergency preamble suggestive of such great urgency that even the usual short delay before the statute would otherwise take effect could not be permitted. It ends now, in 1974, apparently with no building height limitation since 1971, with no building on the lot, and with yet another request for further special treatment to enable the petitioners to accomplish their current objectives for the use of the lot by eliminating the property rights of the respondents arising out of the Commonwealth Restrictions. On this history and the record before us, I do not agree with the court's conclusion that it would be inequitable to deny the petitioners the relief which they seek.

There is some reason to believe that none of the parties presently before the court is in a strong position to request the benefit of a balancing of the equities in his favor[13] but,

---

[13] There was evidence introduced at the trial that the petitioners made studies and plans for construction of a single new building on both their vacant lot and the property of the respondents, and to connect the new building to the present Ritz-Carlton Hotel by bridging the passageway. An exhibit admitted in evidence dated

despite that observation, I cannot be unmindful of the precedential effect which the court's decision of this case will have on a large part of the Back Bay of Boston, far beyond the several parcels of land owned by these particular litigants.

## CONCLUSION.

I would order that the final decree be reversed and that a new decree be entered to the effect that the Commonwealth Restriction requiring the open passageway is specifically enforceable as to both parcels of land owned by the petitioners, and that the restriction requiring a setback from Commonwealth Avenue is specifically enforceable as to the petitioners' vacant lot described in paragraph 2 of their petition.

·

---

November 23, 1970, gave a brief description of this plan, and included the following under the title of "*SITE INFORMATION*":

"*Total Area*:

| | |
|---|---|
| a) 2-10 Commonwealth Avenue (owned by CC&F) | 18,301 s.f. |
| b) 12-14 Commonwealth Avenue (owned by Harry Gorin - Long term lease under final negotiations) | 6,474 s.f. |
| | 24,775 s.f." |

An employee of Cabot, Cabot & Forbes testified that there have been negotiations running over a period of at least eighteen months with representatives of the respondents Gorin and Leeder with respect to the use of their property. The record does not indicate the results of the negotiations.